## THE STATE v. ROBERT SASSAMAN, Appellant.

Division Two, December 15, 1908.

1. **PRELIMINARY EXAMINATION: After Waiver and New Information.** Where complaint was filed and warrant issued, charging defendant with murder, in 1904, and thereafter the law was enacted giving to defendant the right to a preliminary examination, and while that complaint was pending the prosecuting attorney filed an information in the circuit court, and thereafter, upon his arrest in 1906, defendant entered a plea of not guilty and waived examination before the justice, and was committed to jail, and thereafter another information was filed by the prosecuting attorney in the circuit court, it is not error to refuse to quash the last information because no preliminary examination was accorded defendant before he was put upon his trial thereunder. The last information was a continuation of the proceeding, and because the statute of 1905 was enacted

after the committment of the crime is no reason for holding that defendant, having once waived examination, should again be accorded a preliminary examination.

2. ————: **Law of 1905: Purpose.** The Law of 1905 was enacted for a twofold purpose: first, to accord to persons charged with felonies a preliminary examination, to the end that groundless or vindictive prosecutions might not be continued for any length of time; second, to preserve the evidence against a defendant and enable the State to have witnesses enter into a recognizance to appear before the court that has jurisdiction to finally try the cause. It has not application to a case wherein the defendant was arrested and waived an examination before a justice, while an information was pending in the circuit court, and when that information was dismissed a new one was filed and he was put upon his trial without being accorded an opportunity for a further preliminary examination.

3. **INFORMATION: Conclusion: Upon His Oath, Etc.** There is no difference in law between, "And so the said Ewing Cockrell, prosecuting attorney aforesaid, under his oath of office, does say," etc., and, "And so the said Ewing Cockrell, prosecuting attorney aforesaid, on his oath does say," etc. In either case the oath referred to is his official oath. The only oath upon which the prosecuting officer gives the information and makes the charge is his official oath. "On his oath" and "under his oath of office" mean one and the same thing.

4. **MURDER: Instructions for Lower Degree: No Evidence.** Where the information charged murder of the first degree, and there was evidence to support that charge, but none that would authorize the court to submit to the jury any lower grade of the crime charged, the court did not err in confining the instructions to murder in the first degree.

5. **CORROBORATION: Necessity to Define.** It is not essential that the court give an instruction defining the word "corroboration" or the word "corroborate" used in the usual instruction concerning the right of the jury to convict a defendant upon the uncorroborated testimony of an accomplice.

6. **INSTRUCTIONS: Refusing Defendant's.** Where the court in an instruction given has fully and correctly declared the law on a particular subject, it is not error to refuse defendant's instruction on the same subject.

7. ————: **Every Phase of Case: No Exceptions.** Where no exception was saved at the time to the court's failure to comply with defendant's request to give instructions covering all the issues and bearing on special matters to which the court's attention was directed, the assignment is not reviewable on appeal. Besides, in this case, the instructions given covered every phase of the case made by the testimony.

8. **EVIDENCE: Other Crimes.** Testimony directly connected with and bearing a close relationship to the facts going to show that defendant committed a crime, is competent evidence, although it tends to show he had committed another crime. Where defendant was charged with killing a traveler, and the evidence shows that after the traveler had been killed he took the traveler's wagon and team and went on with them, and afterwards sold them, testimony that a bill of sale of the property to him purporting to be signed by the traveler, was a forgery and in fact written and signed by defendant himself, is competent. It is a strong circumstance in connection with the other facts tending to show defendant's guilt.

9. **CONTINUANCE: Judicial Discretion: Impeaching Witnesses.** Where the court does not unsoundly or oppressively exercise its judicial discretion in denying defendant's application for a continuance, a new trial will not be ordered because of such denial. Where three or four of the witnesses alleged to be absent were present and testified, and the others if present would have been used to impeach some of the State's witnesses who were thoroughly impeached, and the specific damaging acts which it is alleged one of the State's witnesses had committed could not have been detailed had the absent witness been present, the court did not abuse its judicial discretion in denying a continuance.

10. ————: **Evidence.** The trial court, in passing upon the application for a continuance, may inspect its own files, such as the subpoenas and the witness-fee book, not for the purpose of controverting the truth of the allegations made in the application as to what the witnesses would testify if present, but for the purpose of determining the good faith of the application and its timeliness.

11. **REMARKS OF PROSECUTING ATTORNEY: Deference to Trial Court.** Where the remarks of the prosecuting attorney, to the effect that "the people in this court room want to see the defendant convicted," are not embraced in the bill of exceptions and were brought to the attention of the trial court by affidavits only, charging that they were made, to which there were counter affidavits that they were not made, a new trial will not be awarded in the absence of anything in the record to indicate that the action of the trial court was arbitrary in the matter.

12. **JURY ROOM: Unsuitable.** Likewise it is the primary duty of the trial court to determine whether or not the room assigned to the jury was so unsuitable as to deprive defendant of a fair trial. He is in a much better position to determine such questions than the appellate court, and if his rulings are devoid of arbitrariness there will be no interference therewith.

13. **ACCOMPLICE: As Witness.** It is not sufficient to destroy the testimony of an accomplice to show that she was not only an accomplice but had for years been an inmate of a house of ill-fame, bore a bad reputation in the communities where she was known, and concealed the crime for several months after it was committed.

14. **CONFLICT IN TESTIMONY: Appellate Practice: Province of Jury.** It is not the province of an appellate court to retry the case upon the testimony disclosed by the record. If there is substantial testimony to fully warrant the finding of the jury, whose province it is to judge of the character, standing and credibility of the witnesses and to settle whatever of conict there may have been in their testimony, their verdict will not be disturbed, if no error was committed in the trial.

Appeal from Johnson Circuit Court.—*Hon. N. M. Bradley,* Judge.

AFFIRMED.

*Joseph K. Tuttle* for appellant.

(1)    The court erred in overruling the motion to quash the information. . First: Because the right of preliminary examination had not been accorded defendant. R. S. 1899, sec. 2476a, Laws 1905, p. 133. Second: Because the information does not charge defendant with the commission of any crime whatever above manslaughter. Third: Because the information is not verified as required by law.    Section 2417, Revised Statutes 1899, provides that "all informations shall be signed by the prosecuting attorney and be verified by his oath."    State v. Bonner, 178 Mo. 430; State v. Schnetter, 181 Mo. 183; State v. Brown, 181 Mo. 221; State v. Hicks, 178 Mo. 445.    The information is defective in not being preferred on the oath of the prosecuting attorney.    "On the oath of office of the prosecuting attorney" constitutes a common law information, not the statutory information prescribed in section 2479, Revised Statutes 1899. State v. Coleman, 186 Mo. 151; State v. Atchley, 186 Mo. 174; State v. Dawson, 187 Mo. 60; State v. Minor, 193

Mo. 604.   (2)   The information does not charge defendant with any crime above that of manslaughter, because the concluding portion says, "And so the said Ewing Cockrell, prosecuting attorney aforesaid, under his oath of office," etc.   It should say, "And so the said Ewing Cockrell, prosecuting attorney, on his oath does say," etc.   State v. Myers, 99 Mo. 116; State v. Ferguson, 152 Mo. 92; State v. Sanders, 158 Mo. 610; State v. Coleman, 186 Mo. 151; State v. Atchley, 186 Mo. 174; State v. Dawson, 187 Mo. 65; State v. Minor, 193 Mo. 604.   (3)   The court erred in refusing to give instruction marked "G" asked by defendant, or in not giving one defining the technical term "corroboration" as requested by defendant so to do.   State v. Reeves, 97 Mo. 668; State v. Hunter, 181 Mo. 334.   (4)   The court erred in permitting the State to prove, against the objection of defendant, that defendant had been guilty of crimes other than the one charged against him in the information, and not withdrawing all evidence tending to prove the commission of such crimes as requested so to do by defendant in instruction marked "K" asked by defendant.   1 Bishop on Criminal Procedure, p. 66; State v. Matthews, 98 Mo. 125; State v. Tabor, 95 Mo. 585; State v. Williamson, 106 Mo. 162; State v. Young, 119 Mo. 495; State v. Maloney, 105 Mo. 10.   (5)   The court erred in admitting, against the objection of defendant, oral testimony in opposition to defendant's application for a continuance, and erred in overruling said application.   State v. Hesterly, 182 Mo. 29.   (6) The court erred in not giving an instruction covering the degree of crime made out by the testimony of defendant.   State v. Partlow, 90 Mo. 608; State v. Young, 99 Mo. 666.   (7)   The court erred in keeping the jury in a small, uncomfortable room for such an unprecedented long period of time, during such extreme hot weather, without an opportunity to have

a bath or a change of linen or underclothing, and it was calculated to coerce the individual members of the jury from the honest convictions of right, seven members of said jury upon the first ballot voting for acquittal and after repeated ballots the jury stood for two long, hot, sultry days, six for conviction and six for acquittal, and the jury unanimously agreeing that if they could sentence the defendant to a term in the penitentiary for a term of from ten to fifteen years they would not have been confined two hours, and their sense of duty under their oaths would not permit them to yield such convictions in order to be released from such close confinement under such uncomfortable conditions.

*Herbert S. Hadley,* Attorney-General, and *F. G. Ferris,* Assistant Attorney-General, for the State.

(1)  The prosecuting attorney in both the charging part and the conclusion of the information states that it is "under his oath of office." That is equivalent to saying "upon his official oath," or "upon his oath." R. S. 1899, sec. 2477; State v. Atchley, 186 Mo. 197; State v. Jones, 191 Mo. 655. (2) The fact that accused had been accorded the right to a preliminary examination is not jurisdictional, and need not be alleged in the information. State v. McKee, 212 Mo. 138. All of the objects of the statute were accomplished by the preliminary examination accorded defendant on November 3, 1906, and, no substantial rights of defendant having been impaired or affected, he has no cause now for complaint. Laws 1905, p. 132; State v. Jeffries, 210 Mo. 302. (3) (a) The trial court may properly deny a continuance where the testimony of an absent witness would be merely cumulative. State v. Webster, 152 Mo. 87; State v. Horn, 209 Mo. 452; State v. Dettmer, 124 Mo. 432. (b) A continuance will not be granted to give time

to procure the attendance of an impeaching witness. State v. Hilsabeck, 132 Mo. 348; State v. Howell, 117 Mo. 307.   (c)   The granting or refusal of an application for continuance is a matter addressed to the wise discretion of the trial court, and, while it is reviewable, it must appear to be unwisely and oppressively refused before this court will interfere with the judgment of the trial court.   State v. Horn, 209 Mo. 452; State v. Crane, 202 Mo. 74; State v. Dettmer, 124 Mo. 432.   (d)   In order to warrant a reversal on the ground of a refusal of a continuance, it must appear from the whole case that the result might have been different had the testimony been given as indicated.   State v. Crane, 202 Mo. 77; State v. Woodward, 182 Mo. 391.   (e)   To determine the good faith of an application for a continuance, the court may not only, as a matter of course, inspect its own records and the records of its officers, but it may also consider counter affidavits.   State v. Dettmer, 124 Mo. 432; State v. Bailey, 94 Mo. 311; State v. Good, 132 Mo. 130.   (4)   Defendant asked the court to discharge the jury on the ground that to hold the jury longer would tend to force the jury to arrive at a compromise verdict, to drive the individual members of the jury from their honest convictions of duty, and to punish said jurors for not yielding their honest convictions.   To the trial judge were submitted affidavits pro and con in reference to the condition of the weather, the character of the jury room as to comfort and convenience, the health of the jurors, and other matters, all of questionable relevancy to the motion.   The motion to discharge the jury does not allege any effort upon the part of the trial court to coerce the jury into making a verdict, nor does it allege any unfairness upon the part of the court other than what may be inferred, if any, from the fact of retaining the jury upon its delibera-

tions for a longer period than twenty-seven hours. It is within the reasonable discretion of the trial court to determine whether and when a jury shall be discharged; and, in the absence of manifest abuse of such discretion, the Supreme Court will not interfere. No such abuse is apparent in this case.    State v. Rose, 142 Mo. 429; State v. Pierce, 136 Mo. 40.

FOX, P. J.—This cause is now pending before this court upon defendant's appeal from a judgment of the circuit court of Johnson county, Missouri, convicting him of murder of the first degree.

On October 5, 1904, Anna Z. Bentley made affidavit before a justice of the peace of Johnson county, charging Robert Sassaman, the defendant, with murder in the first degree, for the killing of one Carl Miller. Upon this charge the prosecuting attorney of said county filed an information against defendant November 3, 1904.    October 30, 1906, the defendant was arrested at Chicago, Illinois, and was brought to Johnson county, where, before said justice of the peace, he pleaded not guilty to said charge and waived a preliminary examination.    On January 25, 1907, in the office of the circuit clerk of Johnson county the prosecuting attorney filed a new or an amended information charging defendant with murder in the first degree.    It was upon this information that the defendant was put upon his trial, the first information having been dismissed.    It is unnecessary to reproduce in full the information charging this offense. The challenge to the sufficiency of it is directed to only one part of the information, and that will be given attention during the course of the opinion.    Upon this new or amended information the defendant was arraigned and pleaded not guilty and upon his application the cause was continued from the February to the June term.

At the June term, on June 21st, 1907, after seventeen men of the special *venire* had been qualified to sit as jurors, defendant's attorneys withdrew from the case, and the court appointed other counsel for the defendant.    At the request of defendant and by consent of the prosecuting attorney, the jurors found qualified were admonished by the court and were allowed to separate, and the further hearing of the case was adjourned to August 5, 1907.    At that date the defendant withdrew his plea of not guilty and filed a motion to quash the information, which was by the court overruled.    He also filed a plea in abatement, which was overruled.    The defendant was again arraigned and again entered his plea of not guilty.    The defendant filed an application for a continuance, which was overruled and a jury was selected and sworn and the trial proceeded.

The testimony introduced on the part of the State upon the trial tended to prove that about the beginning of 1904, defendant, Robert Sassaman, began living with Miss Anna Bentley in rooms in St. Louis.    Miss Bentley was then about twenty years old.    Her mother had died when she was about ten.    She had, as a child, after her mother's death, spent a time in a house of refuge.    At about thirteen years of age she went with her father to Memphis, Tennessee, where she soon married one Chamberlain, with whom she lived a few months, when she was divorced by Chamberlain. At about sixteen years of age she returned to St. Louis, where for over two years she dwelt in houses of ill-fame and frequented wine-rooms.    Defendant was then about twenty years old.    He had known Miss Bentley when they were children, and he knew of her immoral life.    May 2, 1904, they started west together, having a horse, a covered spring wagon and a camping outfit.    About Friday, May 27, on the road in Johnson county, east of Warrensburg, they

overtook Carl Miller, aged about sixty or sixty-five years, who was traveling with a team of horses and a covered farm wagon.    They made friends with Miller and he went on in company with them.    Near a small stream about two miles west of Holden, in said county, they went into camp soon after noon on May 30th.    In the afternoon defendant went hunting, bringing back some game for supper.    After supper the three sat around the camp fire until near midnight, when Miss Bentley, stooping to the fire to get a coal to light a pipe, which she was smoking for the toothache, heard defendant strike Miller near by on his head.    She started to run westward, then turned back eastward, and, as she turned, saw Miller raise his head, and saw defendant grab him by the throat with his left hand and strike him repeatedly on the head with an axe held in his right hand.    As she passed defendant, he seized her and threatened her with death 'if she made an outcry.    Defendant stripped Miller's body of the principal clothing, wrapped a sack around the mangled head, and carried the body on his back westward on the road up a hill about one hundred and fifty yards to a gate, through which he went into a field a short distance to an abandoned well.    Defendant with a rope and a wire tied a rock weighing about thirty pounds to Miller's body, threw the body into the well, and recovered the well with old rails.    The woman followed him to the well and back to the camp.    The woman remained up all night, but defendant went to bed and slept. Early next morning defendant and the woman drove on westward, first having thrown away Miller's coffee pot and some other articles, which were afterwards found in corroboration of the woman's narrative.    Defendant appropriated Miller's team, wagon and outfit, and finally sold same.    They traveled on, stopping for a time at Kansas City, Kansas, and, during the

summer, arrived at Topeka, Kansas, where they camped for several weeks. At Topeka the woman and defendant quarreled about some money. The woman told him she knew something which would put him behind the bars, whereupon he knocked her down, and was restrained by a by-stander from doing her further violence. The woman then left him for good. She secured employment in Topeka, and saved money for the purpose of returning to the scene of the murder in Missouri. About the first of October, 1904, she returned to Missouri and told of the murder to officers of Cass and Johnson counties, and accompanied them to the old well, where Miller's body was found. The story of the murder and discovery of the body was at once published in the newspapers. Defendant at that time was at Kansas City, Kansas, in company with one Caverty, a young man and former acquaintance of defendant. Caverty saw defendant's name connected with the murder in a newspaper and asked defendant about it, who made no reply. Defendant, who was then living with a woman named Izora Hunt, made excuse to her to the effect that he had cut a man and had to flee. He left there at once in company with Caverty. While at Bonner Springs defendant told Caverty that the murder had been planned for a day or two by him and the Bentley woman, and that the plan was for her to do the killing, but she weakened at the last moment and he did it. As soon as defendant and Caverty got back to Kansas City, Caverty went to the city hall and told officers what defendant had told him. Defendant eluded officers for a time. In February, 1906, at Chicago, defendant, in answer to the suggestions that it might not have been a man's body which was found in the well, said to Mr. Hunt, father of Izora Hunt, "Oh, no, it was a man; I put him there myself. I

know it was a man." Afterwards he told Mr. Hunt, "If it hadn't been for that damned woman, I never would have done that job." Defendant also showed Mr. Hunt a paper which he said was a bill of sale from Miller for the team and outfit. That bill of sale was also shown by defendant to Anna Bentley, and to Caverty. Anna Bentley, in 1906, married a Mr. Robbins, of Topeka, and testified by that name at the trial.

The testimony on the part of the defendant was substantially as follows:

Defendant himself took the witness stand. His version of the circumstances of the killing of Miller was different from that given by Anna Bentley Robbins. He said she did the killing and he aided her in secreting the body in the well. He testified that they planned with Miller to steal corn for feed that night, went to bed and got up about midnight when the woman killed Miller as he was at the camp fire. He said that she was very jealous on account of his supposed intention to marry Izora Hunt. While they were living together in St. Louis, he said, she had burned a sofa cushion which Izora Hunt had given him, and while on the road she had burned a button picture of Izora, which he wore, and cut him with a butcher knife. Defendant said that after she had beaten Miller upon the head with an ax, and killed him, she explained her conduct to defendant by saying: "Now, remember, old man, you are in my power. From this on you will do as I say, and if you marry that little bitch at St. Louis, I will show them one thing. I will put this murder at your feet. You remember I am a woman, and my word will go in the court where yours wont." Defendant denied making statements about the murder, as testified to by Caverty and Hunt, and denied having or showing a bill of sale for Miller's team and outfit. He testified

that he had received a letter from Anna Zella Bentley
in her handwriting, in which she expressed herself
as very sorry.   She told about the murder of Mr. Mil-
ler and wrote, "You know I killed him, but you are
the only one on this earth that does know, and I have
already said you done it and mean to stick to it."
A sister of defendant, a former wife of defendant,
and defendant himself identified the handwriting of
said letter, as that of the Bentley woman, and said
letter was put in evidence.   A policeman and saloon-
keeper of St. Louis testified as to the good reputation
of defendant.

In rebuttal, Anna Bentley Robbins denied writing
said letter, and two lawyers, an abstracter and four
bankers, as experts, testified that said letter was not
in the handwriting of Anna Bentley, but was in the
handwriting of defendant himself.

Owing to the importance of this case it may be
well to present a brief abstract of the testimony of
most of the witnesses.

Anna Bentley Robbins, in her examination in
chief, in part testified as follows:   I am twenty-three
years old.   My mother died when I was ten years
old.   My father is living, but I do not know where
he is.   I was born in St. Louis, and have also lived
in St. Paul and Memphis.   My maiden name was
Anna Zella Bentley.   I got acquainted with defend-
ant when I was about eight years old at St. Louis,
Missouri, where we and our parents then lived.   I
played with him and his two sisters about two years.
At a little over thirteen years of age, I was married
to R. P. Chamberlain of Memphis, Tennessee.   We
lived together at Memphis eight or nine months.   He
obtained a divorce from me.   I came back to St.
Louis to live, where I saw defendant once or twice
prior to the time when I went to live with him as
man and wife.   After I left my husband at Memphis,

when I was about sixteen, I went with a pugilist to a house of ill-fame in St. Louis. I lived in several such houses there for about two years. I lived with defendant six or seven months before going on the road with him. We left St. Louis May 2, 1904, in a spring wagon drawn by a bay horse, which, near Chamois, Missouri, we traded for a large white horse. We went along the main line of the Missouri Pacific Railroad. May 27th, east of Warrensburg, we first met an old man who gave his name as Carl Miller. He was traveling by himself in the same direction as we. He was about sixty or sixty-five years old, about five feet five inches high, wore a beard heavily sprinkled with gray, and weighed about 160 or 165 pounds. He had a small sorrel mare, a bay horse a little larger, and a farmer's wagon with an over-jet on it. From Warrensburg we traveled on west in company with Miller. On May 30th, about two and one-half or three miles west of Holden, we went into camp early in the afternoon. After we had our dinner defendant went hunting. While defendant was gone I shaved Miller's neck and trimmed his beard, and he put on a good suit of clothes. About six o'clock defendant came into camp with two quails and a rabbit, which he had killed, and which I cooked for supper. After supper we sat around the camp fire and talked until 11:30 or 12:00 p. m. When Sassaman started to pull off his shoes before retiring, I complained of toothache, and asked him to go to town and get some medicine. They persuaded me to try smoking. I was on the east side of the fire, Miller on south and Sassaman on west. As I stooped down to get a coal to put in my pipe, I heard Sassaman strike Miller on his head. I looked up and saw Miller on his back. I started to run up hill west, and then turned and ran back east. As I started down the hill, Miller raised his head up, and defendant

grabbed him by the throat, and, holding the ax in his right hand near the middle of the handle, defendant hit Miller on the head several times with the ax. As I passed defendant he grabbed me by the arm, pointing a revolver at my head, and said if I made outcry or told he would kill me. Sassaman took off Miller's boots, coat, vest and cap, and went through his pockets. Sassaman put a sack over or around Miller's head, took Miller's body upon his back and carried it west up the hill through a gate, to an abandoned well. I followed a short distance behind. Sassaman tied a rock to the body with a wire and rope and let the body down into the well, and, as it went down, he said, "Jesus, it went down easy." He then covered the well and straightened up the grass around it with his fingers. I says, "Bob Sassaman, if I get half a chance, I will tell this on you;" whereupon he hit me a blow which cut my lip and made my nose bleed. He took hold of my arm, drew his gun on me again, and told me if I ever did tell he would kill me. We went down to the wagon. He threw Miller's cap over the fence into a field. He got into the wagon and laid there all the rest of the night just as though he was sleeping, but I sat up all the rest of the night. That was in Johnson county, Missouri. The next morning he threw Miller's coffee pot and bucket over the fence into the field, and took Miller's things, including ax, check for $50, bear hide, buffalo hide, two lap robes, pillow, quilts, watch, gun and revolver and drove on west, Sassaman driving Miller's team and I the one-horse wagon. After we passed Kingsville, he showed me a paper to which he said he had signed Miller's name and put a cross, and he said that was a bill of sale from Miller for $250 to his outfit. We drove on to Kansas City, Kansas, where we stayed with Will Outterkirk and wife four or five weeks. We then went on to Topeka, where we camped in the back

yard of Mr. D. C. Robbins.    One day there Sassaman and I were quarreling about some money, and I says, "Bob Sassaman, I know something that can put you behind the bars," and, as I said that, he hit me, knocking me down, and he was going to stamp on me when Mr. Robbins interfered.    I then left him, made my home with Mrs. Oleson, and worked out.    I never went back to him after that.    He came to Mrs. Oleson's one time with two boys, saying that he meant business, and that he came to take me dead or alive. He had two revolvers.    I worked until I got money, and then, about October 3rd or 4th, 1904, I went back to Missouri, and told what had happened.

Witnesses by the names of Hogan and Craig gave testimony as to seeing the defendant, the woman and Miller with their wagons and camping outfit together west of Holden on the afternoon of May 20th, and S. T. Sanders saw them several times east of Warrensburg just before that date.

Witness C. C. Bundy testified for the State and in part said: I was circuit clerk at Harrisonville in 1904.    In October, 1904, Mrs. Robbins (*nee* Anna Bentley) came to Harrisonville and told of this murder to the sheriff, prosecuting attorney, myself and several others.    We went with her and located the well, where she said Miller's body was placed, and in it we found the body.    Prosecuting attorney and sheriff of Johnson county also joined us there.

Walter Mosley testified:    Took body out of well at time of inquest.    There was a hole in right side of the head about three inches long, and the head was battered up.    Next morning, I found a gallon bucket and coffee pot near the scene of murder, being the same described by Anna Bentley Robbins.    Miller's body did not have on much clothing, but I don't remember just what it was.    We found in the well a rock weighing 30¼ pounds, with wire and rope tied

around it.     (Rock identified and introduced in evidence.)

Dr. R. L. Bills testified in substance as follows: I was the coroner who held the inquest on the body found in a well west of Holden about the first of October, 1904.     I was present when the body was taken out of the well.     The body was in a very advanced stage of putrefaction.     The fore part of the head was very much mangled, and the right side of the head had quite an opening in it, and, if I remember right, the brains were all gone.     The skull bones were all fractured up pretty badly, and a good many of the small bones dropped back into the well—they were beaten up badly.     I think it would have taken a number of blows with an ax to do that.     I don't think the body had on any shoes or boots.

Mrs. Amelia Oleson gave testimony, and said: I live in Topeka.     Shortly after Sassaman and Anna Bentley (now Robbins) came to Topeka, Anna came to my house and made her home there while she worked out.     Sassaman came there several times and asked her to go back with him.     One time he was a little angry at her, and he said to her: "I come after you this time for the last time, and I will take you dead or alive."     She refused to go with him.     I saw him carrying pistols every time I saw him there. About two or three days before she left for Missouri, in October, the first year she was in Topeka, she told me about this murder.

Rolla D. Caverty, another witness for the State, testified in part as follows:     I am twenty-one years old.     I reside at Kansas City, Kansas.     I knew defendant Sassaman prior to 1904.     In that year I saw him and the Bentley woman in camp there with horses and wagon.     When I first noticed Sassaman he had his back toward me and there was the appearance of blood behind his right ear, and it looked like a little

place run down his neck.    Afterwards that summer I went with him to Mrs. Oleson's where he saw Anna Bentley.    One day after that we were in Kansas City, Kansas.    I saw in a newspaper headlines of an account of this murder, and I asked him, "Is that your name in the paper, Bob?"    The name Sassaman was mentioned in the paper.    He did not say whether it was his name.    He was living there with Izora Hunt at the time, and he was moving.    He went across the street and got a paper.    I went away, and afterwards I went with him to Bonner Springs and then back to Kansas City.    On that trip he told me that the Sassaman mentioned in the paper was he, and that he did it, and if they caught him it would be a case of punishment for life or they would hang him. He told me the crime had been plotted for a day or two; that that night they were to get up and go to a slaughter house near by and get some hides to take to Kansas City to sell, and that Miss Bentley, in the first place, was supposed to do the killing, but that her heart failed her, and then he killed Mr. Miller himself.    He told me he knocked Miller in the head with an ax, and, as he did so, the woman turned to run, and he grabbed her and threatened her, and that she came back and he hit Miller two or three times more in the head, carried him to a well, tied a rock around his neck and threw him into the well.    They then straightened up the grass around the well.    He said the man's name was Carl Miller.    He said that the ax we had on the trip to Topeka was the one he killed Miller with.    He told me about a watch and a pair of boots of Miller's he had, and showed me a bill of sale for the team with Miller's name on it.    He told me if he knew where Anna Bentley was he would get rid of her in a short time, because she was the only witness against him on earth.    He had sold the team at Kansas City.    We got back to Kansas City,

Kansas, and I slipped off from him immediately and went to the city hall and told there the story he had told me.

S. S. Hunt testified in substance as follows: I am the father-in-law of defendant. In the last of February, 1906, I went to Chicago and visited defendant. Perhaps the second day after we got there we were talking about this case, and I said to him that it might not have been a man that was in the well—that it might have been something else. "Oh, no," he said, "it was a man, I put him in there myself. I know it was a man." After that he asked me what he should do in his trouble, and said: "If it hadn't been for that damned woman I never would have done that job." He showed me a paper he said was a bill of sale of that team.

T. W. Goodman testified for the State in substance as follows: I am an undertaker at Holden. I saw the body of the man taken out of an old well about two miles west of Holden early in October, 1904, over which Dr. Bills held an inquest. I examined the skull of the body. The skull was mashed into ten or fifteen pieces. The right side and front were mashed in.

On behalf of defendant, Gustave Hagermeyer, a policeman, and John Smith, saloonkeeper of St. Louis, testified as to the good reputation of defendant.

Mrs. Mabel Bernard, sister of defendant, testified that she knew the handwriting of Anna Bentley Robbins, and that the letter marked exhibit C, D, E and F was in the handwriting of Anna Bentley Robbins.

The letter identified by this witness, marked as above indicated, was then introduced in evidence, and is as follows:

"Kans City Kans jan 27 1905.

"Dear Robert I just heard by some friends where you were at and I thought I would write you a few

lines to let you know how I was getting a long Robert Dear I am very sorry I ever told about the murder of Mr. Miller now dady you know I killed him, but are the only one on earth that does know and I have all ready said you done it and means to stick to it but I will tell you what I will do with you if you will leave that little bitch you are with and come to me we will live together a gain and be happy now daddy I love you and you know it you know I am a fool about you when I would kill a man just to get you to be with me now daddy please answer this and come to me or send for me if I ever see that little bitch I bet you wont live with her long now daddy please send for me I cant live without you I will kill myself if you dont come I cant stand to see you with any one else now rember daddy I am a woman and you are a man if this comes to a trial you will hang because they will believe me you know I told you it first and what I said goes so if you dont send for me you will sure hang you know I am game and will do what I say so if you want to save your neck write to me.    I will close from your loving darling.

"MISS ANNA BENTLEY

"Kans City Kans

"General Delivery.

"P. S. please write you if you get this I am sick to be with you daddy please write."

Mrs. Delia A. Leone testified for the defendant in substance:    I am aged eighteen, a sister of defendant.    In a conversation between S. S. Hunt and defendant's attorney I heard Mr. Hunt say that Sassaman never told him anything about the killing of Miller; that he was not fool enough to do anything of that kind.    Anna Bentley's reputation is very bad.

Robert Sassaman, defendant, testified in his own behalf, and in substance said:    I am twenty-three years old.    I served in the Spanish-American war,

and was honorably discharged.    I began living with Anna Bentley in St. Louis early in March, 1904. While living together there Izora Hunt gave me a sofa cushion.    I told Miss Bentley that Izora Hunt, my intended, gave it to me, and she burned it through jealousy.    We left St. Louis May 2, 1904, with one horse and a spring wagon.    One day while we were traveling we got into a quarrel about Izora Hunt's picture, which I was wearing on my coat, and she grabbed the button (picture) off and threw it into the fire. She struck me with a butcher knife and cut my arm. Just prior to May 30th, it had been raining and the ground was damp.    On that day we reached camp shortly after noon.    We had dinner and I went hunting.    I returned to camp about 5:30 with game, which we had for supper.    We sat around awhile after supper, during which time I had a conversation with Miller about getting feed for our horses.    He proposed to go at twelve o'clock that night to a corn-crib near by and steal some corn.    I objected to stealing, but Miller and the woman made fun of me until I consented.    As we were getting ready for bed, "Dell," as I called Anna Bentley, wanted me to go to town and get some medicine for her toothache, but I did not go.    After we were in bed she asked me to go to the creek and get her a drink.    I told her she did not need a drink, and that for some reason or other she wanted to get me out of camp.    Finally we went to sleep.    At twelve o'clock we got up.    I was sitting on a box putting on my boots; Miller was standing or squatting by the fire, and "Dell" rushed up with the ax and struck the old man.    I says, "My God, Dell, what have you done?"    She told me to never mind; and she hit him a few more times.    She says, "Now remember, old man, you are in my power. From this time on you will do as I say, and if you marry that little bitch at St. Louis, I will show them

one thing; I will put this murder at your feet. You remember I am a woman and you are a man, and my word will go in court where yours won't." I helped her take the body to the abandoned well, tie a rock to it, with wire rope, and put it into the well. We covered up the well with rails, and went back to camp and went to sleep. We got up at 5:30 next morning and started, "Dell" driving Miller's wagon until the team scared. She claimed Miller's outfit. She searched the body for money. I did not get any check. There were in his outfit two lap robes, a bear hide, buffalo robe, cooking utensils, gun, revolver, clothing and bed clothing. We threw over the fence some old cooking utensils. At Pleasant Hill we threw away some of Miller's effects. Rolla Caverty never showed me a newspaper containing an account of this killing, and I never told him a word about the killing. I never told S. S. Hunt I had anything to do with the killing, but I did say to him that if it had not been for this woman I would not have been in this trouble. The letter marked exhibit C, D, E and F is in Anna Bentley's handwriting. I did not tell Mr. Geer that she hit Miller once and he fell forward into the fire. And I did not tell him the reason I helped her after the killing was that she had a hypnotic influence over me.

Albert Gains testified in substance: Heard the woman known as the Cuban woman (Modesta Alpizer) tell Rolla Caverty to testify just as she told him, and he said he would.

Laura Belle Ryle, another witness for defendant, stated: I am an actress and live in St. Louis, and am the first wife of defendant. The letter introduced in evidence and marked as an exhibit is in the handwriting of Anna Zella Bentley.

In rebuttal the State introduced witnesses. James A. Kemper and R. M. Robertson, lawyers; W. L.

Hedges, E. N. Johnson, Marcus Youngs, and F. L. Mayers, bankers, and Wm. E. Crissey, abstracter, who testified as experts in handwriting, that the letter marked exhibit C, D, E and F was in the handwriting of defendant, and not in the handwriting of Anna Bentley.

Anna Bentley Robbins, recalled, denied writing letter marked exhibit C, D, E and F.

James Koch and H. E. Jones testified that the gate at scene of murder was up a hill about 150 to 180 yards west of the camping place.

Louis M. Geer testified: I am constable of Madison township in Johnson county, Missouri. I brought defendant back to this State from Chicago, where he was arrested for this crime. On the trip back he voluntarily told me that when Anna Bentley struck Miller, that Miller fell forward into the fire. He indicated that she struck two blows. He said the reason he helped her put the body away was because she had a hypnotic influence over him.

At the close of the evidence the court gave its instructions to the jury and the cause was submitted to them. We shall not reproduce the instructions given to the jury or those requested by the defendant and refused by the court, but we will give the complaints as to the declarations of law proper consideration in the course of the opinion. The jury returned their verdict finding the defendant guilty of murder of the first degree and assessed his punishment at imprisonment in the penitentiary during his natural life. Timely motions for new trial and in arrest of judgment were filed and subsequently taken up and overruled by the court. Sentence and judgment followed in accordance with the verdict, and from this judgment the defendant prosecuted this appeal, and the record is now before us for review.

## OPINION.

The record discloses numerous assignments of error which it is insisted were committed during the progress of the trial of this cause.

We will give the complaints urged by the appellant such attention as we deem necessary and their importance requires.

### I.

It is insisted by learned counsel for appellant that the trial court committed error in overruling defendant's motion to quash the information. This insistence is predicated upon three grounds:

*First*: That the defendant was not accorded the right of a preliminary examination as is provided by law. [Laws 1905, p. 133.]

*Second*: Because the information does not charge the defendant with the commission of any crime other than manslaughter.

*Third*: Because the information is not verified, as required by law.

Directing our attention to the question suggested that defendant was not afforded a preliminary examination, it is essential, in order to fully appreciate that question, to briefly refer to the disclosures of the record concerning that question. It will be observed that this offense is charged to have been committed upon the 30th of May, 1904. Upon the 5th day of October, 1904, Anna Z. Bentley appeared before J. W. Greenwood, a justice of the peace in and for Johnson county, and filed an affidavit or complaint in writing and upon her oath, under which the defendant, Robert Sassaman, was charged with the murder of one Carl Miller; whereupon the justice on said 5th day of October, 1904, issued his warrant based upon said complaint, directed to the sheriff or constable of said county, commanding them to take the defendant and

safely keep him to the end that they might have his body forthwith brought before the justice to answer said complaint. This complaint was continued from time to time for the reason that the defendant could not be found within the county of Johnson, but on the 30th day of October, 1906, the warrant as issued by the justice of the peace was executed and the defendant was arrested in the city of Chicago, Cook county, Illinois, and he was brought before the justice on the 3d day of November, 1906. Upon defendant's appearance before the justice the justice's docket discloses the disposition of the cause of complaint pending before the justice. It recites:

"On this the 3d day of November, 1906, the warrant was returned executed by having the body of the defendant before me as commanded, and thereupon the justice informed the prisoner of the charge against him and read the complaint to him after being requested to do so, and thereupon the defendant after hearing the reading thereof entered a plea of not guilty, and waived examination before me, J. W. Greenwood, a justice of the peace, within and for said county on said charge.

"And thereupon a *mittimus* was issued to the jailer of the county of Johnson, commanding him in the name of the State to receive the said Robert Sassaman, into his custody, in the jail of Johnson county, there to remain until he be discharged by due course of law, and delivered to Lewis M. Geer, constable of Madison township, for execution.

"Given under my hand this the 3d day of November, 1906.  J. W. GREENWOOD,

"Justice of the Peace."

It is further disclosed that while the complaint was pending before the justice of the peace, the then acting prosecuting attorney, Mr. Charles Morrow, filed an information in the circuit court charging the de-

fendant with the murder of Carl Miller, being the same offense as charged in the complaint before the justice. This information was dismissed and the information as heretofore stated on January 25, 1907, upon which the defendant was tried, was duly filed. Upon this state of the record it is earnestly insisted by counsel for appellant that the information upon which the defendant was tried and convicted should have been quashed for the reason that the defendant was not accorded the right of a preliminary examination, as provided by law. To this insistence we are unwilling to give our assent.

The fundamental error assumed by appellant upon this proposition is in treating the information filed January 25, 1907, upon which the defendant was tried, as the commencement of this prosecution. This information, by counsel on both sides of this case, is referred to as a new information. In a certain sense it may be so classified, but it by no means follows that the prosecution of this cause was commenced at that time, and that before such information could be filed or proceeded with a preliminary examination had to be accorded to the defendant. This prosecution was begun on October 5, 1904, prior to the enactment requiring a preliminary examination before an information was filed. The complaint of witness Anna Z. Bentley was predicated upon section 2441, Revised Statutes 1899, which provides that whenever a complaint shall be made in writing and upon oath to any magistrate hereinbefore mentioned, setting forth that a felony has been committed and the name of the person accused, it shall be the duty of such magistrate to issue a warrant reciting the accusation, and commanding the officer to whom it is directed to forthwith take the accused and bring him before such magistrate to be dealt with according to

law.  Section 2447, Revised Statutes 1899, provides for the preliminary examination upon this complaint. Section 2460 provides for the taking of bail, if the offense with which the prisoner is charged be bailable. Section 2461 provides that if the offense be not bailable the prisoner shall be committed to the jail of the county in which the same is charged, there to remain until he be discharged by due course of law.

In this case we are confronted with the record of the justice of peace which the law requires him to keep, which says in express terms that the defendant was brought before the justice, entered a plea of not guilty, and expressly waived any preliminary examination.  This the defendant had the right to do.  The offense with which this defendant was charged was not bailable, and upon his waiving the preliminary examination the justice very properly issued his warrant of commitment under the provisions of section 2461.  This warrant of commitment expressly required the officer to present the defendant to the jailer of the county there to be committed by him until he be discharged by due course of law.

If the defendant had been charged with some other felony which was bailable, and had waived a preliminary examination and entered into a recognizance to appear at the next term of the court which had jurisdiction to try the case, and the proceeding which required him to give such bail and the giving of the bail were prior to the enactment of the law which required a preliminary examination, it certainly will not be seriously contended that the prosecuting officer could not continue the prosecution of the defendant, which was begun before the justice, by filing an information charging the same offense with which he was charged before the justice, without suspending the prosecution in order to grant a preliminary examination, which was required by provisions of law which

214 Sup.—46

were enacted subsequently to the commencement of the prosecution before the justice. In the supposed case the defendant had waived a preliminary examination and entered into a recognizance to appear before the court to be there dealt with according to the due course of law, and simply because the information which continues the prosecution which was begun prior to the enactment of the law, is filed subsequent to the enactment of a law which required a preliminary examination, would not require a suspension of the prosecution until the defendant could be accorded a preliminary examination.

So it may be said in the case at bar, the prosecution against this defendant was begun before a justice of the peace by the filing of a complaint as provided for by section 2441. The defendant expressly waived his right under the law to have a preliminary examination, and the justice did the only thing that he was authorized to do under the provisions of the law, the case not being a bailable one, issued his warrant of commitment, and had the defendant confined in jail, there to remain until he was discharged by due course of law. There had been in this case an information filed in the circuit court prior to the enactment of the law of 1905, which required a preliminary examination, and that information was dismissed and the one upon which the defendant was tried duly filed. The defendant was confined in jail awaiting either the action of the grand jury, or of the prosecuting officer who was authorized to file an information charging him with the offense for which he had been committed, and under that state of the record the prosecuting officer was fully warranted under the law to continue the prosecution begun before the justice of the peace, and followed up by his predecessor, in the circuit court prior to the enactment of the law of 1905, by filing the information of January 25, 1907. The defendant

had expressly waived any preliminary examination and was confined in jail by proper commitment awaiting the filing of a charge, either the returning of an indictment by a grand jury or a charge by information by the prosecuting attorney charging the commission of the offense for which he was confined in jail. Under this state of the record it was by no means incumbent upon the court to suspend the prosecution by quashing the information and requiring a preliminary examination to be accorded to the defendant, simply because subsequent to the commencement of the prosecution, and while the defendant was awaiting the action of the grand jury or the prosecuting officer the law of 1905 was enacted, which required a preliminary examination to be held.

The law of 1905 was doubtless enacted for a twofold purpose—one was to accord to persons charged with felonies a preliminary examination, to the end that groundless or vindictive prosecutions might not be continued for any length of time. The other was to preserve the evidence against a defendant and enable the State to have the witnesses enter into a recognizance to appear before the court that had jurisdiction to finally try the cause. It is clear that the provisions of that statute have no application to a case like the one as is disclosed by the record in the case at bar. In our opinion the action of the court was entirely proper in declining to quash this information upon that ground.

It is next insisted that the information does not charge the defendant with any crime other than that of manslaughter, and learned counsel for appellant predicates this contention upon the concluding portion of the information. Using the language of counsel for appellant in assigning this error he says: "Because the concluding portion says, 'And so the said Ewing Cockrell, prosecuting attorney aforesaid, *under his oath*

*of office,' etc.,"* when, as contended for by appellant it should say, "And so the said Ewing Cockrell, prosecuting attorney, *on his oath does say,"* etc.

It is sufficient to say of this proposition that in our opinion it has no merit. It will be observed at the very inception of the consideration of this question that the prosecuting attorney starts out by saying that the information is given under his oath of office, and concludes the charge with saying "And so the said Ewing Cockrell, prosecuting attorney aforesaid, under his oath of office does say," etc. The only oath upon which the prosecuting officer gives this information and makes this charge is the one under which he is resting by virtue of his oath of office. The prosecuting officer can only make this charge upon his oath of office, and should he have concluded this information as suggested by counsel for appellant, *on his oath,* the oath therein mentioned contemplates none other than his oath of office; hence we are unwilling to say that because the prosecuting officer somewhat broadened the usual conclusion, and in place of saying *on his oath does say,* etc., the information is bad. The use of either of those terms amount to the same thing. It simply means that he presents this charge upon his oath of office, and can mean nothing else, for that is the only oath he is required under the laws of this State to take.

In State v. Atchley, 186 Mo. 174, this court clearly indicated that the terms "upon his official oath" and "upon his oath" were synonymous and meant the same thing. It was held in that case that the prosecuting attorney's information was defective for the reason, as stated by the court, that "neither in the charging part nor in the conclusion of his information herein, has the prosecuting attorney of Dallas county said that *'upon his official oath'* or *'upon his oath'* the said

Benjamin Atchley wilfully, deliberately, premeditatedly and of his malice aforethought him the said William Bramwell in the manner and form and by the means aforesaid did kill and murder, against the peace and dignity of the State." This contention must be ruled adversely to appellant.

Finally, upon this motion to quash, it is urged that the information was not properly verified as required by law. It will suffice to say upon this proposition that the record discloses that the information was duly and properly verified at the date of its filing, January 25, 1907; the clerk, however, in his jurat preserving the evidence of the administration of the oath to the prosecuting attorney, recites, "Subscribed and sworn to before me this 25th day of February, 1907." This was clearly a mistake of the clerk, for it is disclosed by the record that he filed the information and his filing is indorsed upon it on January 25, 1907. That this was simply a clerical mistake was further disclosed by an admission on the part of the defendant's counsel that a certified copy of the information, verified as aforesaid, was served on defendant within three days after January 25, 1907. That the verification of this information was sufficient is too plain for discussion.

## II.

Appellant complains that the court committed error in giving instructions numbered 1 and 2. We have fully considered the instructions complained of. Number 1 is the leading instruction requiring the jury to find every essential fact necessary to constitute the offense with which defendant is charged, and is in form which has repeatedly met the approval of this court.

Instruction number 2 is simply the usual instruction defining the terms wilfully, deliberately, premedi-

tatedly, malice and malice aforethought, and they were defined by the court in perfect harmony with repeated adjudications upon those subjects. Again, it may be said that it appears from the brief of counsel that it is not claimed that instructions numbered 1 and 2 are erroneous by reason of any failure to require the jury to find all the essential elements of the offense of murder in the first degree as charged in the information, or that the technical terms treated of were not properly defined, but the objection seems to have been predicated upon the theory that by reason of the improper conclusion of the information, as contended by appellant, the information failed to charge murder of the first degree. We have indicated our views upon the question as to the conclusion of the information, which resulted in ruling that the contention of appellant upon that proposition was untenable; hence it must necessarily follow that no assignment of error concerning the instructions given can be predicated upon a contention which we have indicated cannot be maintained.

It is further insisted that the court committed error in refusing instructions requested by the defendant designated A, B, C, H and J. It is sufficient to say upon this action of the court in declining the request of the defendant as to the instructions designated, that we have examined the instructions requested by the defendant, and have fully considered them. In our opinion the action of the court in declining to give the instructions prayed for was entirely proper.

Instruction A was one requested at the close of the evidence in chief in behalf of the State, directing the jury to find the defendant not guilty. B was to the same effect, except it was requested at the close of all the evidence introduced in the cause. C was an instruction directing the jury that under the information in this case the jury was not authorized to convict the defendant of any degree of crime above

that of manslaughter.   It is only necessary to say as to that instruction that there was no manslaughter in this case.   Instruction H was as follows:

"The court instructs the jury that if you believe from the evidence in this case that someone, other than the defendant, without a preconcerted design on the part of the defendant, at the county of Johnson, in the State of Missouri, at any time within three years prior to the 25th day of January, 1907, killed Carl Miller, and that after the said killing was done defendant aided the slayer of Carl Miller in concealing the body or afterwards aided the offender to escape from the scene of the crime, or he, knowing that such offender had committed the crime, gave to such offender any other aid with the intent and in order that the offender might escape, or avoid arrest or trial or conviction or punishment, then you will find defendant guilty as an accessory after the fact and assess his punishment at imprisonment in the penitentiary not exceeding five years or in the county jail not exceeding one year nor less than six months, or by fine not less than four hundred dollars, or by both a fine of not less than one hundred dollars and imprisonment in the county jail not less than three months."

It is clear that this instruction was properly denied.

Instruction J was one upon murder in the second degree.   It is only necessary to say concerning that instruction that the facts as developed at the trial of this case did not furnish a basis for directions to the jury by the trial court upon any grade of homicide other than that as charged in the information, murder in the first degree; hence there being no testimony which would authorize the court to submit to the jury any lower grade of the crime than that charged, the action of the court in confining its instructions to murder in the first degree was proper.   [Wharton on

Homicide (3 Ed.), 243; State v. Donnelly, 130 Mo. 642; State v. Risley, 136 Mo. 100; State v. Kindred, 148 Mo. 270; State v. Henderson, 186 Mo. l. c. 487; State v. Gartrell, 171 Mo. 489.]

It is next insisted that the court erred in refusing the request of the defendant to give instruction marked "G." This instruction was one purporting to define the term corroboration, and it is argued by counsel for appellant that this instruction should have been given, or at least that the court should have given one defining the term corroboration. This instruction, as requested by appellant, was as follows:

"By the term, 'corroboration,' as used in these instructions, is meant proof of facts and circumstances by other witnesses, independent of the testimony of an accomplice, or accessory, that of themselves tend to prove that the person on trial is guilty of the offense charged against him. Proof, even by other witnesses, of the 'corpus delicti,' which in this case means the death of the person named as Carl Miller, nor the finding of a dead body at a place where any accomplice or accessory said one could be found, nor the proof of wounds or bruises on said dead body similar to those described by such accomplice or accessory, are not corroboration of such accomplice or accessory as used in these instructions and as required by law, and cannot be taken as corroborative facts, but such independent facts so testified to by other witnesses must go further and of themselves tend to prove that the defendant on trial actually committed the offense charged against him in the information."

That this instruction should not have been given is too plain to even furnish any reason for the discussion of it; but if it was essential that the court should define the term "corroboration," it may be conceded that the requesting of this instruction was sufficient to make it incumbent upon the court to give a

proper instruction defining that term. It is apparent that the defendant's request of the court to give an instruction defining the term "corroboration" is predicated upon the fact that that term is used in instruction numbered 5 given by the court. This instruction was as follows:

"The court instructs the jury that they are at liberty to convict the defendant on the uncorroborated testimony of an accomplice alone, if you find from the evidence in this case that any witness who has testified before you was an accomplice; and by an accomplice is meant a person who actually commits or participates in the crime, if they believe the statements as given by said accomplice are true in fact and sufficient in proof to establish the guilt of the defendant; but the jury are instructed that the testimony of an accomplice in crime, when not corroborated by some person or persons not implicated in the crime as to matters material to the issue, that is, matters connecting the defendant with the commission of the crime charged against him, and identifying him as the perpetrator thereof, ought to be received with great caution by the jury, and they ought to be fully satisfied of its truth before they should convict the defendant on such testimony."

The question involved in this proposition is fully answered in the recent case of State v. Bobbitt, 215 Mo. 10. It was contended in that case, just as it is in the case at bar, that the instruction did not explain the meaning of the word corroborate. The instruction as given in that case, which is substantially the same as instruction number 5 given by the court in the case at bar, was quoted, and this court in responding to the contention made by the appellant, said: "The point is made that this instruction does not explain the meaning of the word 'corroborate,' and various cases in this court are cited on this question. This instruction,

however, is exactly like the one given in State v. Harkins, 100 Mo. 1. c. 672, which met the approval of this court. An instruction similar in all material respects was approved by this court in State v. Donnelly, 130 Mo. 642, and an instruction exactly like it was approved in State v. Dawson, 124 Mo. 422; State v. Crab, 121 Mo. 554; see also State v. Jackson, 106 Mo. 179, and State v. Woolard, 111 Mo. 248. The case of State v. Hunter, 181 Mo. 316, had reference, when rightly understood, to the proof necessary to convict in cases of perjury.''

Appellant also complains at the action of the court in refusing instruction ''I.'' This instruction treated of the subject of the opinions of the expert witnesses during the progress of the trial on questions of handwriting. There was no error in the refusal of this instruction for the reason that the court in one of its instructions, No. 10, fully covered that subject in a way that has frequently met the approval of this court.

Upon the subject of instructions it is finally contended by the appellant that the trial court committed error in its failure to instruct the jury in accordance with defendant's request for instructions covering all the issues, and in special matters to which the attention of the court was directed. It is sufficient to say upon that proposition that the record fails to disclose the proper preservation of that question for review. There was no exception made at the time to the failure of the court to do what had been requested by the defendant. But aside from all this we have carefully analyzed all of the instructions given by the court, as well as those refused. It is disclosed by the record that the court of its own motion gave ten instructions, and at the request of the defendant gave six additional ones, which made sixteen instructions presented to the jury. These instructions, in our opinion, fully

covered every phase of this case to which the testimony was applicable, in fact some of those given at the instance of the defendant were but mere repetitions in the treatment of subjects which had been covered by the instructions given by the court upon its own motion. Clearly there was no necessity for any other instructions in this cause. The instructions given fully covered the case, and after a careful examination of the instructions requested by the defendant and refused by the court we are of the opinion that the court properly denied the other instructions requested by the appellant, commencing with the designation of them with the letter "A" to the letter "O" inclusive.

### III.

Complaint is also urged upon the action of the court in the admission of testimony, which, it is contended by appellant, sought to show that the defendant was guilty of other crimes. We have given this testimony very careful consideration, and have examined the disclosures of the record in detail concerning this particular question, and have reached the conclusion that the contention of learned counsel for appellant upon this subject should not be maintained. There was no evidence admitted to which the defendant interposed any objection, as to the commission of other crimes, with the view of prejudicing the jury against the defendant, thereby endangering his right to an impartial trial. There was testimony introduced and this was without objection, but whether objected to or not, it was clearly competent, showing that defendant had in his possession a bill of sale purporting to have been signed with "his mark," by the deceased, Carl Miller, the party charged to have been killed, to certain property that he had with him, and the evidence further indicated that this bill of sale was not executed by Carl Miller, but was in fact written and signed

by the defendant himself. That testimony was clearly competent and was a strong circumstance in connection with the other facts developed at the trial tending to establish the guilt of the defendant. While it may be said that that state of facts constituted the offense of forgery, yet it is manifest that that was not the purpose of the testimony. It was admitted upon the theory that it was directly connected and bore a close relation to the other facts developed in the case. There was no objection to this testimony, and aside from that it was clearly competent as a circumstance against the defendant.

There was other testimony in respect to the marriage of defendant to Izora Hunt. The court of its own motion in instruction numbered 4 expressly directed the jury that such testimony had been withdrawn from the consideration of the jury, and that they should not consider it in ariving at their verdict. In addition to this the record discloses that the court, when Mr. Hunt was being examined directly as to the marriage of his daughter to the defendant, sustained the objection to that testimony. However, in the course of Mr. Hunt's examination he did make a statement of facts from which the jury might draw the conclusion that Sassaman and his daughter were married; but with the ruling of the court sustaining the objection to the testimony as to Mr. Hunt, when speaking directly of the marriage, together with the instruction withdrawing from the consideration of the jury all testimony in reference to any marriage, we are inclined to hold that this remedied any complaint predicated upon the admission of that testimony, and that what was done by the court in that respect did not constitute such error as would authorize and warrant this court in reversing this judgment.

## IV.

It is next insisted that the court committed error in overruling the application of the defendant for a continuance. This application embraced the names of seven or eight witnesses, that were alleged to be absent, but upon the trial the record discloses that all of them appeared with the exception of three or four. One of the absent witnesses, Dr. Olin D. Whittier, it is alleged would testify that the general reputation of the defendant for truth and veracity, honestly and fair dealing and morality was good. By absent witness G. A. Bode it is averred that the defendant expected to prove also that his general reputation for honesty, fair dealing, peace and quiet and morality was good, and that the reputation of Anna Bentley Robbins in the city of St. Louis, where she resided, for truth and veracity, virtue and chastity and peace and quiet was extremely bad. It was further alleged in the application for continuance that he expected to prove by this witness an assault upon some certain person, whose name to the affiant was unknown. Absent witness Albert Bernard, it is averred, would have testified as to the bad general reputation of Anna Bentley Robbins for chastity and virtue; would have testified that she lived in open adultery with one Charles Bernard. As to the other absent witness, William Outterkirk, it is alleged he would have testified to a certain state of facts, which is detailed, indicating that Anna Bentley was not under any duress or restraint whatever by the defendant. It is also alleged that this witness, Outterkirk, would testify to the bad general reputation of Anna Bentley for truth and veracity and for virtue and chastity, and it is also stated that this witness, Outterkirk, was acquainted with the handwriting of said Anna Bentley, and that certain papers now in the possession of the defendant, containing very dam-

aging admissions, were written by the said Anna Bent-
ley.

Upon the disclosures of the record there was no
error committed by the court in its action denying this
application for a continuance.

In State v. Dettmer, 124 Mo. l. c. 432, it was said,
in denying an application for a continuance, that "it
has become the uniform rule of this court to defer to
the trial court in such matters, and not to reverse its
action, unless the party assailing that action makes it
plainly to appear that the judicial discretion in that
regard has been unsoundly or oppressively exercised,"
citing State v. Banks, 118 Mo. 117.

To the same effect is State v. Horn, 209 Mo. 452.
It has repeatedly been said by this court that the grant-
ing or refusing of an application for a continuance is
a matter addressed to the discretion of the trial court,
and while it is reviewable, it must appear to be un-
wisely or oppressively refused before this court will
interfere with the action of the trial court. [State v.
Horn, supra; State v. Crane, 202 Mo. l. c. 75, and
State v. Dettmer, supra.]

Conceding for the purposes of this case that the
application was in due form and indicated proper dili-
gence in securing the attendance of the absent wit-
nesses, yet, it is plainly manifest that the testimony of
these witnesses was sought for the purpose of impeach-
ment, and for the purpose of adding their testimony,
to that of other witnesses upon the same subject. As
to the good reputation of the defendant, that fact was
established by two or three witnesses who testified
in the cause, and as to the bad reputation of the wit-
ness, Anna Bentley Robbins, the testimony disclosed
by the record is overwhelming that her reputation was
bad, and, in fact, for chastity and virtue, her own testi-
mony practically concedes her standing in the com-
munity in that regard. As to the other testimony of

Outterkirk, concerning the handrwriting of Anna Bentley Robbins, it is sufficient to say that two or three witnesses identified the letter written to the defendant as being in her handwriting.  It is sufficient to say as to the averments in the application about proving specific acts, such as an assault by Anna Bentley Robbins upon some unknown person, and the fact of her living in adultery with Charles Bernard, that they would have not been competent had the testimony been offered.  Those are simply specific acts of misconduct, and the inquiry must always be directed to the general reputation of the witnesses, and it has been repeatedly ruled by this court that evidence of specific acts going to establish the bad reputation of a defendant or a witness are not admissible.

There is an entire absence from the record of anything which indicates that the trial court unsoundly or oppressively exercised its judicial discretion in passing upon this application.  We repeat that there was no error in the action of the court denying this application for a continuance.

It is further insisted in connection with the application for a continuance that the court committed error in permitting the State to introduce evidence upon the hearing of such application.  The record discloses that the only evidence introduced consisted of the witness fee book and certain subpoenas and the clerk of the court was sworn for the purpose of identifying the records in his custody.  There were neither affidavits nor oral testimony introduced for the purpose of controverting any of the allegations in defendant's application for continuance as to what the testimony of the absent witnesses would be.  The court clearly had the right to consult its own files and to inquire of its clerk for the purpose of determining the good faith of this application.  It has been ruled by this court that the trial court may not only inspect its own record

and the records of its officers, but it may also consider counter affidavits, not for the purpose however of controverting the truth of the allegations made by the application for a continuance as to what the testimony of the witnesses would be. [State v. Dettmer, supra; State v. Bailey, 94 Mo. 311; State v. Good, 132 Mo. l. c. 130, 131.] This contention cannot be maintained, and the ruling upon that question must be adverse to the appellant.

## V.

Error is also assigned and predicated upon the remarks of the prosecuting attorney in his argument to the jury, as well as the action of the court, as contended by appellant, in compelling the jury to occupy a room in their final consideration of this case which was unsuitable for such purposes and was calculated to coerce the jury to reach a verdict.

The record discloses numerous complaints of remarks made by the prosecuting attorney, but counsel for appellant simply direct our attention to what seems to have been, if made, the most serious statement made by the prosecuting officer, that is, that the prosecuting attorney in his closing argument to the jury, said that "the people in this court room want to see the defendant convicted." The fact that the prosecuting attorney made this remark has not been duly authenticated by embracing it in the bill of exceptions which was signed by the trial judge, but there are affidavits in support of the motion for new trial as well as counter affidavits by the prosecuting attorney as to the use of these terms. The same may be said as to the room which the jury occupied in the consideration of this cause upon its final submission.

There were affidavits *pro* and *con* upon that question, hence it follows that we are simply, both as to the question of the remarks of the prosecuting attorney

and the nature and character of the room occupied by the jury, confronted with affidavits on both sides, which were submitted to the trial court.  Upon the consideration of these affidavits concerning the room occupied by the jury and the remarks of the prosecuting attorney the trial court denied the motion for new trial, which in effect was an adverse ruling to the defendant upon the questions presented in the affidavits.  The trial court heard this case, and, presumably, is familiar with everything that was said and done during the progress of the trial; at least the parties were all before the court and it had much better opportunity to determine the right of this question than is afforded this court upon the mere disclosures of a lifeless record, and there being an entire absence from the record of any indication of any arbitrary action on the part of the court in the determination of the questions presented, or in passing upon the motion for new trial, we are inclined, as was ruled in State v. Page, 212 Mo. l. c. 241, to indulge the presumption that the trial judge dealt fairly and impartially with the defendant in its action upon the motion for a new trial.

## VI.

This brings us to the final insistence on the part of the appellant, that is, that the testimony introduced upon the trial of this cause is insufficient to support the verdict.  We have at great length recited in the statement of this cause the important parts of the testimony both for the State and the defendant tending to prove or disprove the issues presented to the jury.  It can accomplish no purpose to repeat that testimony.  It is sufficient to say, after consideration of the testimony disclosed by the record in detail, that we have reached the conclusion that the testimony developed upon the trial of this cause was not only sufficiently satisfactory to warrant the jury in reaching

their conclusion, but presents such an array of facts that so strongly and unerringly point to the guilt of this defendant, that it is difficult to comprehend how any other conclusion could be reached than that returned by the jury in their verdict. It is not sufficient to absolutely destroy the testimony of Anna Bentley Robbins to say that she was an accomplice and bore an extremely bad reputation in the communities in which she was known, and the further fact that she did not disclose what she knew concerning this case for months afterwards. It may be true that she was an accomplice, but an accomplice may tell the truth, and under the laws of this State she was a competent witness, and the court in very appropriate terms cautioned the jury as to the consideration and reception of her testimony unless corroborated by other persons not in any way connected with the commission of the crime.

The record before us disclosing the many details connected with this terrible and outrageous murder, shows in many places a thorough corroboration of some of the most important features of Anna Bentley Robbins' testimony. It is argued that it is quite significant that this woman concealed her knowledge of the commission of this murder for months after it was accomplished. This may be conceded to be true, but that is no more significant than the fact that the defendant, who claims that Anna Bentley committed this murder, with equal secretiveness concealed his knowledge of it.

We deem it unncessary to pursue this subject further. The testimony introduced on the part of the State furnishes ample support for the conclusion reached by the jury. The witnesses were before the jury and it was their province to judge of the character, standing and credibility of such witnesses, and the weight to be attached to their testimony, as well as their province to determine and settle whatever

conflicts there may have been in the testimony of the respective witnesses.

This court will not undertake to retry this case upon the testimony as disclosed by this record, there being substantial testimony which fully warranted the finding of the jury. As has been repeatedly ruled by this court, such finding will not be disturbed for the reason that there may be some conflict in the testimony of the witnesses testifying in the case.

We have given expression to our views upon the leading and controlling propositions involved in the record before us, and the conclusion reached is that the judgment of the trial court should be affirmed, and it is so ordered. All concur.