THE STATE v. JAMES UNDERWOOD, Appellant.

**Division Two, February 23, 1915.**

**MURDER: Sufficient Evidence.** There must be a total failure of evidence, or it must be so weak as to justify the conclusion that the verdict is the result of passion or prejudice on the part of the jury, or else the appellate court will not disturb the judgment on the alleged ground of the insufficiency of the evidence. And the evidence of defendant's guilt being substantial, and the instructions being full, fair and clear expressions of the law applicable to the case under the evidence, and no prejudicial error having occurred during the trial, the judgment fixing defendant's punishment at twenty years' imprisonment in accordance with the verdict finding him guilty of murder in the second degree, is affirmed.

Appeal from Jackson Criminal Court.—*Hon. E. E. Porterfield,* Judge.

AFFIRMED.

*Handy & Swearingen* for appellant.

(1) The court erred in giving instructions 3, 4, 5, 6 and 7 on behalf of the State. State v. Edwards, 203 Mo. 539; State v. Herrold, 97 Mo. 106; State v. Vaughan, 141 Mo. 514. (2) The court erred in refusing defendant's instructions A and B. The court undertook to instruct the jury on circumstantial evidence, but we contend that by reason of the fact the court gave an instruction on self-defense over the objection of defendant, the instruction on circumstantial evidence was of no value to the defendant and tended to mislead the jury more than it did to guide them. The defendant denied killing Johnson and the contention of the defendant is that if Johnson was murdered at all, it was after he and Miller left him at the Intercity Viaduct. Our contention is, that when the court gave an instruction on circumstantial evidence and then

gave one on self-defense, the two instructions were conflicting and the court committed reversible error; if the blow delivered by the defendant at the house of Daisy Long caused the death of Johnson, then it was error to give instructions on circumstantial evidence; if, on the other hand the blow did not cause the death of Johnson, then it was error to give instructions on self-defense. In State v. Herrold, 97 Mo. 106, this court said: ''When two instructions are conflicting, it cannot be told which the jury took for their guide, instructions should not be given upon which there is no evidence to base them.'' Stevenson v. Hancock, 72 Mo. 612; Bluedorn v. Railroad, 108 Mo. 450; State v. Edwards, 203 Mo. 539.

*John T. Barker*, Attorney-General, and *S. P. Howell*, for the State.

(1) Where complaint is made that the court erred in admitting or rejecting evidence, and such testimony is not pointed out in the motion for a new trial, or in appellant's brief, such assignment is not available on appeal. State v. Brown, 168 Mo. 474; State v. Bartlett, 170 Mo. 672; State v. Holden, 203 Mo. 584; State v. Whitsett, 232 Mo. 529. (2) Where there is any substantial evidence submitted on the trial to support the verdict, this court will not interfere. State v. Howell, 100 Mo. 659; State v. Orr, 64 Mo. 445; State v. Dickson, 78 Mo. 450; State v. Howell, 117 Mo. 346; State v. Lackland, 136 Mo. 32; State v. Miller, 156 Mo. 76; State v. Tettaton, 159 Mo. 380; State v. Barrington, 198 Mo. 23; State v. Rumfelt, 228 Mo. 451; State v. Jackson, 95 Mo. 661; State v. Sassman, 214 Mo. 738; State v. Concelia, 250 Mo. 424. (3) Where objection to the instructions given is not made a ground of the motion for a new trial, such error, if any, is not reviewable on appeal. It is urged in appellant's brief that the court erred in instructing the jury on self-

defense and circumstantial evidence. In view of the fact that no complaint whatever is made in the motion for a new trial to the giving of the instructions on circumstantial evidence and self-defense, this assignment urged in appellant's brief is not properly preserved to entitle it to consideration on appeal. Under the circumstances of this case the instructions named would not be reviewable for the further reason that they are favorable to the defendant and, therefore, he will not be heard to complain. State v. Brannon, 206 Mo. 636; State v. George, 214 Mo. 267; State v. Foley, 220 Mo. 89; State v. Whitsett, 232 Mo. 529; State v. Connors, 245 Mo. 477; State v. Bostwick, 245 Mo. 486; State v. Foley, 247 Mo. 607; State v. Horton, 247 Mo. 663; State v. Brown, 209 Mo. 413; State v. Woolard, 111 Mo. 256; State v. Shelton, 223 Mo. 138. (4) In instruction number two, the elements constituting murder in the first and second degrees are indicated and the terms "wilful," "felonious," "deliberately," "premeditated," "malice" and "aforethought" are correctly defined. State v. Myers, 221 Mo. 698; State v. Wright, 134 Mo. 404; State v. Weeden, 133 Mo. 75; State v. Fitzgerald, 130 Mo. 420; State v. Grant, 152 Mo. 66; State v. Tettaton, 159 Mo. 365; State v. Harper, 149 Mo. 521. Instruction number three correctly advised the jury as to the crime of murder in the first degree. State v. Thomas, 78 Mo. 337. In instruction number four the elements necessary to constitute murder in the second degree are correctly stated. State v. Wilson, 95 Mo. 447; State v. McCarver, 194 Mo. 728; State v. Myers, 221 Mo. 614. Instruction number five properly stated the facts that must be shown by the evidence in order to find the defendant guilty of manslaughter in the fourth degree. State v. Hyland, 144 Mo. 302; State v. Thomas, 78 Mo. 327; State v. Heath, 237 Mo. 270. In instruction number six the character of the evidence by which the intent to commit a criminal act may be shown is announced. State v. Merker, 189 Mo.

320. Instruction number seven on the proof or failure of proof of motive is in an approved form. State v. Duestrow, 137 Mo. 74; State v. Barrington, 198 Mo. 23; State v. David, 131 Mo. 396. Instruction number eight is an approved instruction on presumption of innocence and reasonable doubt. State v. Knock, 142 Mo. 524; State v. Hudspeth, 159 Mo. 208; State v. Neustin, 25 Mo. 123; State v. Cushenberry, 157 Mo. 182. In instruction number nine, the circumstantial evidence rule is announced. State v. Bauerle, 145 Mo. 16; State v. Tettaton, 159 Mo. 367; State v. Taylor, 134 Mo. 151; State v. David, 131 Mo. 398; 21 Cyc. 1032. In instruction number ten the law as to the right of self-defense is correctly anounced. State v. McCarver, 194 Mo. 729; State v. Groves, 243 Mo. 550; State v. Lewis, 248 Mo. 508. In instruction number eleven the rule as to credibility of witnesses is properly stated. State v. Hicks, 92 Mo. 434; State v. Henderson, 186 Mo. 492; State v. Hudspeth, 159 Mo. 200.

WALKER, J.—An information was filed by the prosecuting attorney in the criminal court of Jackson county charging defendant with murder in the first degree in having killed one Joseph Johnson in Kansas City on the night of October 8, 1913. Upon a trial the defendant was convicted of murder in the second degree and his punishment assessed at imprisonment in the penitentiary for a term of twenty years. From this sentence defendant has perfected this appeal.

On the night of October 8, 1913, the deceased, a farmer from the State of Kansas, went, in company with two or three others, at about 12:30 o'clock a. m., in defendant's automobile, the latter being a chauffeur operating a machine for hire, to a house of prostitution. As they came in one of the girls heard the defendant say to the keeper of the house that he had brought "a bunch that had plenty of 'jack,'" meaning money. They remained at the house probably half

an hour, took several rounds of drinks, and then went
away in the defendant's machine. Half an hour or an
hour later defendant returned with the deceased, the
latter being almost helpless from the effects of liquor.
After they had gone to the room of one of the girls
they were served with beer, but the deceased was so
drunk that he was unable to hold his glass and it was
taken from him by the girl. The woman who kept the
house was named Daisy Long. In payment for the
drinks the deceased gave her a five dollar bill, which
she kept, giving him no change, and immediately left
the room. Defendant left the room with her, but re-
turned in a few minutes and demanded a dollar from
the deceased for bringing him to the house. The de-
ceased searched his pockets and declared he had no
money but had been robbed. The defendant denied
this, adding, "You will pay me you s— of a b—— or
I will kill you." The deceased reached for his hat,
when defendant struck him over the head with either
a gun or a "black-jack." The latter is explained to
be an instrument used by criminals in the nature of a
loaded piece of hose or other soft exterior substance
filled with lead, iron or other metal, and causes no
abrasion of the outer skin when a blow is struck with
it. The blow felled the deceased to the floor. Immedi-
ately thereafter Daisy Long, the keeper of the house,
entered and held a hurried inaudible conversation
with defendant, and again left the room. As she went
out defendant pushed Marie Haley, in whose room
they then were, against the door and, thrusting a gun
into her face, said, "Don't you say anything about this
or I will kill you." He then left the room and Marie
Haley ran out into the hall and screamed, "Oh my
God, somebody come up and get this man [deceased],
he is dying." In answer to this call, Daisy Long and
a creature named Rats Miller with whom she was then
living, rushed into the room, followed by a negro maid
and another inmate of the house. The maid and the

girl who had just entered procured water and washed the blood from the head and face of deceased, and assisted by Rats Miller, laid him on the bed. The deceased at the time was either in a semi-conscious condition from drink or the effects of the blow, and groaned as he rolled from side to side. Daisy Long then said to the defendant, "What shall we do with him [meaning the deceased]?;" to which the defendant replied, "I will take him and dump him some place." Marie Haley asked the defendant if he would kill anybody, and he replied that it was an every night occurrence with him. Daisy Long then said to the defendant, "Jimmy, don't go away, come back and take this man from my house." Rats Miller and the defendant and a man named Red Anderson who had been visiting the house carried or assisted the deceased downstairs to the automobile, which was standing before the entrance. Several persons who witnessed the removal of the deceased from the house, state that he was so helpless from loss of blood or drink, that it was necessary for the defendant and Miller to catch him by the shoulders and practically carry him downstairs. He was placed in the automobile, Miller took a seat by his side, the defendant cranked his machine and started away going west on Sixth street towards the bluffs. It was then about 1:30 o'clock in the morning, or possibly later; the negro maid testified that it was two o'clock. An hour or more thereafter the defendant and Rats Miller returned to the Long house and were admitted by the negro maid. The defendant stayed but a short time, but Miller remained during the balance of the night.

About seven o'clock that morning, two police officers in the vicinity of Sixth and Bluff streets, looking down from the Interstate Viaduct, saw the body of a man lying at the foot of the retaining wall about fifteen feet from the edge of the viaduct. The body was lying eight or ten feet from the foot of a retaining

wall which extended from the bottom of the cut to where the officers were, a height of about forty-six feet. Along the upper edge of this bluff or cut was a fence four feet high at the point where the officers stood when they discovered the body. It was resting on some iron pipes which enclosed signal wires, near to and parallel with railroad tracks laid along the centre of the cut. Examining the body, a cut was found on top of the head; the face was bruised, the abrasion being filled with cinders; the eyes were blackened and swollen, and the left leg was crushed or thrown out of joint. Other officers reached the scene soon afterwards who corroborate the statements made by those who discovered the body. Midway between the edge of the bluff and the bottom of the cut there was a shelf or projection immediately beneath which the body was lying. The officers found that the earth which had accumulated on this shelf had been partially brushed off or disturbed as though an object thrown from above had struck on the shelf. Fresh earth below in the cut near the body was of the same character as that on the shelf. There was no blood on the body and but a small spot of the circumference of a silver dollar where the head was lying. A *post mortem* examination disclosed cuts near the right eye; the left corner of the lower lip was torn; the left side of the face was scarred; the nose was broken and there were multiple fractures on the posterior of the skull. The left leg was broken and the bone stuck up against, but did not protrude through, the outer skin. There had been no recent hemorrhages from these wounds and the physicians who conducted the *post mortem* gave it as their opinion that the abrasion and fracture occurred after death, that if produced by the fall the wounds would have bled and evidence thereof have been found where the body was lying. In the opinion of these witnesses death was caused by the multiple fractures of the skull, the injury on the side of the head or face be-

ing a contributing cause; that these wounds .appeared to have been inflicted by something like a "black-jack." In the pockets of the deceased was found the business card of the defendant, "Jas. Underwood, chauffeur." After the *post mortem* the body was taken to an undertaker's, where it was identified by several girls from the Long house as that of the man who was taken therefrom in an automobile by the defendant and Rats Miller the night before. Defendant, upon being taken to the undertaker's and shown the body, said he had never seen the man before.

The defendant and Rats Miller were the principal witnesses for the defense. The defendant testified that he took deceased and three or four others to Daisy Long's house on the night of October 8, 1913. After spending a half an hour or more there he took them to a saloon at Thirteenth and Main streets, Kansas City. Leaving them there he returned with the deceased to Daisy Long's. The deceased proposed that defendant take him and some of the girls to St. Joseph, but the plan was abandoned and defendant asked the deceased for a dollar car fare he claimed the latter owed him. Johnson claimed he did not owe the bill and reached back towards his pocket, when defendant struck him with his revolver, felling him to the floor. In this and other respects defendant's testimony differs materially from that of the State's witnesses, viz.: that he struck the deceased at Daisy Long's because he apprehended from the motions of the latter that he was about to draw a weapon; that the deceased was not carried or assisted out of the house and into the automobile, but walked out and entered the machine of his own accord; that deceased was boisterous and abusive, and that neither he nor Miller touched him or offered him any violence, but, presuming that he wanted to go to St. Joseph, stopped near the Wabash Railway freight station, when the deceased got out of the automobile and walked away;

that defendant did not recognize the body of deceased at the undertaker's because the face was so disfigured and swollen that it bore no resemblance to the man as he recalled him when he had taken him from Daisy Long's.

Defendant is in the main corroborated as to matters occurring while they were together by Rats Miller. The jury did not believe their testimony.

I. *Sufficiency of Evidence.* The jury found the evidence ample to sustain the verdict. We have reviewed it, and find no such lack of substantial proof of guilt as to authorize us in reversing the judgment. Under this state of facts the reiterated rule may be properly invoked that there must either be a total failure of evidence or it must be so weak as to justify the conclusion that the verdict was the result of passion or prejudice, or it will not be disturbed. [State v. Concelia, 250 Mo. 411; State v. Rumfelt, 228 Mo. 443; State v. Sassaman, 214 Mo. 695; State v. Barrington, 198 Mo. 23.]

II. *Instructions Given.* The court gave eleven instructions, covering murder in the first degree, murder in the second degree, manslaughter in the fourth degree, defining the intent with which a criminal act is done, stating how motive or want of motive is to be considered, defining the presumption of innocence and reasonable doubt, how circumstantial evidence should be considered, what constitutes self-defense, that the jury are the judges of the weight of the evidence and the credibility of the witness and how the testimony is to be considered. These instructions were full, fair and clearly expressed the law applicable to the case under the evidence. They conform to precedents which have received the approval of this court in a large number of cases. They were, in short, all that defendant could have demanded to properly instruct

the jury as to his defense. For cases containing approved precedents for the instructions given, see the respondent's brief.

III. *Instructions Refused.* The court ruled properly in refusing the instructions asked by defendant. The first, because not authorized by the evidence; and the second, because instructions given by the court properly declared the law as to circumstantial evidence and reasonable doubt. We have reviewed with care every point properly preserved which has been urged by industrious counsel for defendant to sustain a reversal. None urged are sufficient. The guilt of defendant having been established to the satisfaction of the triers of the facts, and no prejudicial error having occurred during the trial, the judgment should be affirmed, and it is so ordered. All concur.