# THE STATE v. NADINE FRISBY, Appellant.

Division Two, December 4, 1919.

1. **MURDER:** Sufficient Evidence: Passion of Jury. Where the guilt of defendant depends on the truth of the testimony of an accomplice, the product of a mind untroubled by any trace of conscience and unstung by any suggestion of remorse, yet so startling in its crude simplicity and so vivid in its graphic realism, that, if it is a manufactured lie, it becomes a form of fiction far above the expected creation of so uncouth a mind, and if true it establishes defendant's guilt beyond question, it was the province of the jury to say whether his story was fact or fiction, and there being nothing

State v. Frisby.

to indicate prejudice or passion on their part, their verdict of guilty will not be set aside on the ground that the evidence was not sufficient to sustain it.

2. **EVIDENCE: Admitted Without Objection: Motion to Strike Out.**
A party cannot sit by and permit questions to be answered without objection, and then except to the answer and present it for matter for review in the appellate court. So where three witnesses, who knew the State's principal witness in former years in the county in which he then resided, but did not know him in the county where the crime was committed, were permitted, without objection, to testify that his reputation for truth, veracity and morality were good at the time they knew him, an exception to their answers will not be reviewed on appeal.

Appeal from Cooper Circuit Court.—*Hon. Hopkins B. Shain,* Judge.

AFFIRMED.

*W. G. Pendleton* and *Roy D. Williams* for appellant.

The trial court erred in permitting the State to introduce evidence to show good reputation of the State's witness John Jones in Boone County three years before the trial. This evidence was objected to by defendant's counsel and exception was taken to its admission by the court. James Carter secretly disappeared from Columbia in Boone County, migrated to Pilot Grove in Cooper County and changed his name to John Jones when he crossed the Missouri River. Evidence to support the credibility of a witness must be confined to the time he testifies, and in the neighborhood where he then resides. State v. Summar, 143 Mo. 221; Wood v. Matthews, 73 Mo. 447. Reputation three years previous to the trial is too remote. Wood v. Matthews, 73 Mo. 447.

*Frank W. McAllister,* Attorney-General; *S. E. Skelley* and *H. B. Hunt,* Assistant Attorneys-General, for respondent.

The trial court did not err in permitting Whiteside to testify that the reputation of State's witness Jones,

for truth, morality and virtue was good, during his residence in Boone County three years before the trial. Underhill Crim. Ev. (2 Ed.) p. 429, sec. 236; 5 Jones on Ev. sec. 859, p. 256; 40 Cyc. 2597, b, c; Wood v. Matthews, 73 Mo. 482; State v. Summar, 143 Mo. 230; State v. Pettit, 119 Mo. 414; State v. McLaughlin, 149 Mo. 31; State v. Miller, 156 Mo. 84; Lindsey v. Bates, 223 Mo. 310.

WILLIAMSON, J.—The appellant, Nadine Frisby, upon an information filed in the Circuit Court of Cooper County, charging her with the crime of murder, was convicted and sentenced to imprisonment in the penitentiary for life. From that sentence this appeal is taken.

It is urged that the evidence is insufficient to support the verdict. The only other question presented in this record is one concerning the admission of evidence relating to the reputation for truth and veracity of one John Jones, *alias* Jim Carter, a witness for the State, who was at the time of the trial confined in the Missouri Penitentiary under a life sentence for the actual killing of the same person for whose murder the appellant was convicted. No other questions are presented in this court. The facts are substantially as follows:

The appellant, Nadine Frisby, was the wife of one James Frisby. John Jones was a friend of the appellant and her husband, and was a frequent guest at their home. Appellant and her husband lived in the town of Pilot Grove, and Jones was employed by a farmer named J. J. Maddox, who lived about a mile southeast of Pilot Grove. The deceased, James Frisby, a negro, was the husband of appellant and was employed as a janitor in the Pilot Grove Bank. Jones and appellant are also both negroes. Early in the morning of the 19th day of May, 1917, the dead body of James Frisby was found at the back door of the bank. There were two gashes across the head, the body was lying upon its face, and the hip pockets of the trousers worn

by the deceased were turned inside out. An iron bar weighing about seven pounds, and apparently a part of a buggy axle, was found some ten or fifteen feet from the body. The wounds above mentioned had apparently been inflicted with this weapon. The deceased was usually paid on the 18th day of each month. No money was found on the body. The night before the killing, which apparently occurred some time about 4:30 in the morning of May 19th, John Jones had stayed at the home of appellant and her husband, James Frisby. Shortly after the murder was discovered, suspicion was directed to appellant and John Jones, and they were arrested and charged with the murder. On the day upon which the tragedy occurred, a negro preacher had a conversation with appellant before she was arrested, in the course of which, as he testifies, she inquired whether or not it would be advisable for her to employ an attorney, since she felt sure that she would become involved in the matter before it was all over, and also inquired whether or not a law had been passed in this State abolishing capital punishment. Jones, it seems, had been a frequent visitor at the Frisby home for a year or two previous to the commission of the offense charged, and appellant did his washing for him. They frequently associated together among people of their race, and were apparently regarded as being close friends. Jones usually slept at Mr. Maddox's home, but on the night that the tragedy occurred he did not sleep there. He arrived at Mr. Maddox's home at about twenty minutes before five o'clock on the morning of the 19th day of May, 1917. Jones was the principal witness for the State, having been brought back from the penitentiary to testify.

In substance, Jones's testimony was to the effect that he had formerly lived in Boone County; that he was married and had a wife and several children; that his name was James Carter; that a year or two before the tragedy occurred he deserted his wife and children, left Boone County and came to Cooper County; that

he changed his name while crossing the river and assumed the name of John Jones; that he became acquainted with appellant and her husband shortly after he removed to Cooper County, and was frequently a guest in their home; that he had never had any trouble with the deceased, and had no ill feeling toward him. According to his story, on the night before the murder occurred, he was at Frisby's house and talked with the deceased there about eight or nine o'clock in the evening. Appellant was then away from home. Jones inquired for her, was told where she might be found, and went in search of her. He found her some distance away from home, and told her that he wanted to get his clothes. He and she started through an alley to return to the Frisby home, walking very slowly. As soon as they were alone, appellant suggested to Jones that she had a proposition to make to him. What then ensued is best told in his own language:

"I says: 'A proposition?' She says: 'Yes.' I says: 'Allright, what is that?' 'Well,' she says, 'the proposition I want to make with you, to make away with the old man.' 'Now, listen a minute! I am going to stop a little on that.' That is, me hesitating with her question.

"That is, not that I am not going to talk, but hesitating with her question—answering her. [He had stood mute when called as a witness on a previous trial of this case.] I kinda walked along, you know, hesitating, not saying anything, and when I says anything, I says: 'Well, why is that?' 'Oh', she says, "I am tired of him.' She says, 'I don't want him.' She says, 'I am tired of the old bald-headed son-of-a———, anyway.' I says: 'Well, if you don't want him and tired of him,' I says, 'why don't you leave him?' I says, 'If you don't want to be with him,' I says, 'get you a divorce.' 'Oh,' she says, 'I don't want to do that.' She says: 'I want this here money.' I says: 'Oh, yes! Money! I see! Well,' I says, 'what money?' She says: 'Insurance.' I says: 'Well,' I says, 'If you

want this money, then, insurance,' I says, 'how much is it?'' She says: 'About a thousand dollars; somewhere like that.' I says: 'About a thousand dollars. You don't know then whether it is a thousand dollars, or not?' She says: 'No, I don't know exactly. It is somewhere like that. ' I says: 'I guess then it is somewhere about nine hundred and fifty, seventy-five or eighty dollars; yes, something like that. Uh, huh. I see!' Well, we were still walking along very slow. I says: 'Now, let me tell you,' I says, 'I don't see how in the world that I could do anything like that.' 'Well,' she says, 'You can do that very easy.' I says: 'Well, I don't see how.' I says: 'Nothing to do nothing with; aint got nothing.' I says, 'How are you going to do anything like that when you aint got nothing to do anything with.' I says: 'Another thing, I don't know no way.' 'Oh,' she says, 'you danged fool, you, are you crazy?' She says: 'I can show you and tell you, too.' 'Uh, huh!' Well, we walks along very slow still yet. She says to me, she says, 'You know he gets up in the morning early.' I says: 'Yeh,' I says: 'About what time?' She says: 'He gets up in the morning you see about four o'clock. He has got to get over to the bank to clean up.' I says: 'Yeh.' I says: 'Well, you must remember that this day and time now, at this time of the year, at four o'clock is very near daylight. Time for people to be getting up.' I says: 'But, furthermore, you see at that time in the morning how in the world do you suppose I was going to do anything like that. People would be up and around and lights would be shining, and they would see me.' 'Why,' she says, 'Set the time up.'—'Uh, huh! Set the time up!' I says: 'Well, how would you go about doing that?' 'Why,' she says, 'I will show you.' She says: 'Have you got your watch?' I says: 'Yes, I have got my watch.' Well, we set the time up. . . . We still hadn't got down to the house yet. We were still walking so very slow, you see, we were walking as slow as a pig could walk, going along through the chute. Well, we

got to the yard gate, going through the gate between the yard and the house, and between the gate and the house door we stopped and stood there and talked. She says: 'Well, have you got your mind made up yet?' I says: 'No, it isn't made up yet.' She says, 'Well, you ought to get it made up so we will get him out of the way.' I says: 'Well, it is just like as I have told you. I aint's got nothing and don't know no way.' She says: 'Well, I have told you the way.' I says, 'Well, how are you going to do anything when you aint got nothing?' 'Oh,' she says, 'I seen a piece of iron laying over there by the side of the fence the other day.' I says: 'Over where?' She says: 'Between the house and the fence there.' 'Uh, huh!' So, well I looks down, you see, so, well, I goes over that way a little piece and made a step or so. Well, I begin to feel between the fence and the house. . . . Well, I feels over toward the side of the house. About that far from the house (indicating), kinda down along the side there, I finds a piece. Well, I picks it up. She says: 'Well, did you get it?' I says: 'Yeh.' So I says: 'Now, then, where will I put it?' She says: 'Oh, lay it down over there by the side of the gate, in order—by the side of the gate so when you went out of the gate you could pick it up.' Well, we goes in the house. I sets down in a chair by the side of a little stand table. She was standing up out in front of me in the floor. So she says: 'Have you got your mind made up yet?' I says: 'No, my mind aint made up yet.' She says, 'Well, make it up.' I says. 'Well—' she says: 'You got your watch?' I says: 'Yes.' She says: 'Where is it at?' I says: 'Here it is.' And pulled it out of my pocket. . . . She says: 'Now, take and run it an hour fast.' I says: 'Run it an hour fast?' I says, 'Well, I don't know hardly how to do that.' She says: 'Oh, hand it here. I will do it.' I says: 'Oh, no. I will do that.'"

Jones accordingly set his watch up about an hour, and he and the appellant continued talking until somewhere about eleven o'clock. The unsuspecting host and

husband had gone to bed in an adjoining room while they completed the plans for his slaughter.   Twice during the night appellant called to Jones and asked what time it was, and Jones announced the time as shown by his watch, which was an hour fast.   Deceased was thus led into going to work an hour earlier than usual.   At about 3.30 that morning, according to the correct time, but at about 4:30 a. m. as shown by Jones's watch, he and deceased prepared to go to work.   Jones left the house first, picked up the iron bar and went around to the back door of the bank, where he knew the deceased was accustomed to come in the performance of his duties as janitor.   Shortly afterwards deceased came to the back door, and Jones struck him, twice in the head with the iron bar, instantly killing him, searched his pockets for money and apparently found none, and went immediately to the home of Mr. Maddox, about a mile from town.   In the course of their conversation on the night of the killing, Jones testifies that appellant said she would give him, Jones, about two hundred and fifty dollars of the insurance money, and he could leave the country, and that she thereafter would come to him.   An iron bar was offered in evidence, and identified by Jones as being probably the instrument of death.

While in jail and after he had been tried and sentenced to the penitentiary, Jones wrote a letter in which he said, in substance, that the prosecuting attorney had offered him certain inducements if he would implicate appellant in the murder, but that she was innocent. This letter was delivered to one of appellant's attorneys. After being sent to the penitentiary, Jones wrote a letter to one of appellant's counsel, in which he reiterates, in substance, his statements in the former letter, and again says that appellant had no connection with the crime.   On the witness stand he explained that neither of these letters was true; that he wrote the first at the persistent solicitation of another negro, who was apparently a friend of appellant and was confined in the jail with Jones; and that he wrote the second letter

State v. Frisby.

at the instigation of appellant herself. It appears that she had had some communication with him while he was still in the jail. The statement that any inducement had been held out to Jones to implicate appellant in the affair was denied by James R. Miller, who was with the prosecuting attorney at the time he visited Jones at the jail.

The evidence for the appellant consists chiefly of her own testimony, which in substance was a complete denial of all of the incriminating portions of Jones's evidence.

Appellant presented the two life insurance policies which the deceased had to the proper companies, and it seems that one of them would have been worth about one hundred and fifty dollars "if deceased had not been killed the way he was," and the other policy was worth about seven dollars and a half. The undertaker collected the $7.50 and applied it to the payment of the funeral expenses of the victim. From a commercial standpoint, the enterprise was a failure.

In rebuttal, the State called J. L. Whiteside, T. A. Vallandigham, and John L. Fisher, who testified that they had known Jones for several years during his residence in Boone County, and that his reputation for morality, truth and veracity was good at that time. On cross-examination they all testified that they had not known anything of him since his removal to Cooper County about a year and a half before the tragedy occurred. One of them did not profess to have known anything of him for three years, and another for five years preceding the tragedy. Neither of them professed to know anything about his reputation in Cooper County, nor at the time of the trial. The admission of this evidence as to the reputation of this witness is assigned as error by appellant in this court, and she also insists that the evidence is insufficient to support the verdict.

Concerning this evidence, the record is as follows: When the witness J. L. Whiteside was put upon the stand by the State, he was asked if he knew the general

reputation of the witness Jones "for truth, veracity and morality." To this question the defendant objected and the objection was sustained. The witness was then asked what was the reputation of the witness Jones for morality only. No objection was made to this question. During the cross-examination of the witness, the court announced that if the prosecution would avow its intention of putting a witness on the stand to prove that Jones had a good reputation for truth and veracity in 1917, the year in which the tragedy occurred, then the court would permit the testimony as to Jones's reputation for truth and veracity for three years prior thereto to be introduced as corroboration. The prosecuting attorney avowed his intention of introducing such evidence (and later did so), and the court then asked the witness Whiteside, referring to Jones: "Well, what was his reputation for truth and veracity in Columbia three years ago?" and the witness answered that it was good, as far as he knew. There was no objection to this action on the part of the court, but after the question had been asked and answered, the record shows that "the defendant by her attorneys then and there duly excepted at the time, and still excepts."

T. A. Vallandighan and John L. Fisher were then called as witnesses by the State and examined as to the general reputation of the witness Jones for truth, veracity and morality. No objection was made to this evidence. These are the three witnesses to the admission of whose evidence objection was made. Appellant's reputation for morality, truth and veracity was shown to be bad.

We think this is a sufficient statement of the facts.

This is the second appearance of this case in this court. The opinion on the former appeal is not yet published in our reports, but may be found in 204 S. W. 3.

On the former trial, the witness Jones stood mute. Absent his testimony, the conviction of appellant was reversed. At the last trial Jones testified and we have

set out his evidence at some length, partly as a convenient method of stating the facts, partly because it is a curious, not to say morbid, study in psychology, but chiefly because it is assailed in appellant's brief as "incredible and fantastic," and insufficient to support the verdict. The jury did not find it incredible, and it was the special province of the jury to pass on that question. Nevertheless, 'if the testimony of this witness—and it is practically all of the evidence relied upon by the State to induce and uphold the conviction—is of so weak a nature that it wholly fails to sustain the charge of murder, or necessarily indicates that a verdict based upon it is the result of passion and prejudice, then the verdict should be set aside. Appellant challenges our attention to that point, and we hence proceed to a study of that testimony.

It is a strange tale, the product of a mind untroubled by any trace of conscience, and unstung by any suggestion of remorse; startling in its crude simplicity, and yet so vivid that it grips attenton. The mind cannot shake it off. To say that it is all fiction, a lie manuflactured, with or without assistance, by this uncouth murderer, is to credit him with an artistic ability, an insight into the workings of the human mind, and a graphic realism which would place him on a plane not far below that of the author of Treasure Island, or of The Murders of the Rue Morgue. In short, it is a greater strain upon credulity to believe that this ignorant negro manuflactured this hideous tale than to believe that he simply told the truth. We can believe that this horror-story is the product of his memory, but not of his imagination. Note its fidelity to detail. When the crime is first suggested, observe how his slow mind gradually absorbs the plan to murder and the arguments in its favor. "She says: 'I want this here money.' I says: 'Oh, yes! Money! I see! Well,' I says, 'if you want this money, then, insurance:' I says, 'how much is it?'" He is told, and he speculates on the amount. "'Uh-huh, I see!' We were still walking so very slow,

you see, we were walking as slow as a pig could walk, going along through the chute.'' In the darkness the plotting pair approach the house, and the woman suggests where the iron bar may be found. ''Well, I begin to feel between the fence and the house. . . . Well, I feels over toward the side of the house. Kinda 'long down the side there, I finds a piece. Well, I picks it up'' It is the instrument of death. Then come the suggestion of setting his watch up and the slow dawning of that thought; the woman's fierce impatience; the pre-conceived calls through the night, and, finally, just before he starts upon his murderous errand, he pictures his accomplice as lying upon her stomach in bed and secretly motioning to him to hasten his departure, while their intended victim, unmindful of impending doom, stoops to tie his shoe laces!

It was for the jury to say whether the story was fact or fiction, but certainly there is here neither a total failure of evidence, nor evidence so weak as to impel the conclusion that belief in it is the result of prejudice or passion. That being the case, we accept the findings of the lawfully constituted triers of fact, and rule this point against appellant. [State v. Gulley, 272 Mo. 484; State v. Underwood, 263 Mo. 677; State v. Snyder, 263 Mo. 664.]

Small space is necessary in which to dispose of appellant's complaint concerning the testimony of the character witnesses. The record shows that evidence was admitted without objection. A party cannot sit by and permit questions to be answered and then, without preliminary objection, except to the answer and thus present that matter for review here. [State v. Harris, 199 Mo. 716; State v. Sykes, 191 Mo. 62; State v. Rapp, 142 Mo. 443; State v. Marcks, 140 Mo. 656.]

No other error is assigned, and our examination has revealed none. The judgment is affirmed. All concur.