## THE STATE v. NESENHENER, Appellant.

164 461
171 ² 59

### Division Two, November 12, 1901.

1. **Morphine Poisoning:** SATISFACTORY EVIDENCE: ANALYSIS. In cases of morphine poisoning the most satisfactory and convincing evidence of the poisoning is the discovery, by analysis, of the contents of the stomach, of the existence of morphine or traces of it. And in case of uraemic poisoning, the discovery should be by an analysis of the urine.

2. ———: ———: CASE STATED. Defendant purchased a small phial of morphine at a drugstore the day previous to her husband's death and this was found the next day (on the evening of which he died) in the vault of the closet on his premises, and was identified at the trial. On the same day the morphine was purchased, deceased, who had been in poor health for some time, complained of his stomach and that his food did not agree with him, sent word to his regular physician that if he would call at his residence he would pay him some money for services. The physician called, and deceased paid

State v. Nesenhener.

him money, and complained of uneasiness in the stomach, and asked the doctor to prescribe for him, which he did. At that time deceased was apparently not in great agony. During the night deceased was ill again, and suffered considerable pain and vomited. Early in the morning defendant's son-in-law, who lived nearby, having been sent for by her, found deceased sitting in the door purging himself, with a vessel in front of him containing greenish matter which he had vomited. Defendant went for a doctor, and deceased lay down on the bed and never regained consciousness, dying at nine o'clock p. m. of that day. The defense was that deceased died from uraemic poisoning. The experts testified that deceased's face was blue, the neck discolored and the face swollen, the pulse soft, slow and regular, and the breathing hard and labored, and that with the exception of the soft pulse and tightly contracted pupil of the eye, all these symptoms might have been caused by uraemic poisoning. There was no evidence that defendant had given deceased any medicine of any kind, or food. *Held*, that, in such case a chemical examination of the contents of the stomach or bowels or of the matter ejected from them, should have been made for ascertaining if there was morphine poisoning, and of the urine for uraemic poisoning, but as neither was done, the evidence is insufficient to support a verdict of murder, and defendant is discharged.

Appeal from Hannibal Court of Common Pleas.—*Hon. D. H. Eby,* Judge.

REVERSED.

*Geo. M. Harrison* for appellant.

*Edward C. Crow,* Attorney-General, for the State.

(1) In a case of this kind it is not necessary to prove how much of any particular poison it would take to destroy life, or that such quantity was found in the body of deceased. The evidence of medical men may be offered as to whether the death was caused by poison or not, and, although they may not be willing to declare that it was by poison, the fact may be sat-

isfactorily established by various independent facts and circumstances, such as the prisoner's motive and opportunity, and whether he had or procured the poison, and every part of his conduct with relation to the matter. 3 Greenleaf's Evidence, 325; Kelley's Criminal Law, 311. And it is sufficient if the jury is satisfied from all the circumstances beyond a reasonable doubt that the death was caused by poison administered by the prisoner. In the absence of an autopsy, the determination as to the cause of the death must be established by the group of symptoms which invariably accompany and characterize poisoning by morphine. In a poison case the cause of death must be ascertained; the possession of the poison by the accused and the opportunity to use the same, together with the motive, should be shown. In this case the testimony when examined by the court will satisfactorily show that the cause of the death was morphine poison. The group of symptoms that accompany morphine poison were all present. All the medical testimony shows that one symptom existed in the case of the deceased that never exists in uraemic poison and always is present in morphine poisoning to-wit, a soft pulse. The testimony showed that in uraemic poisoning the pulse is always hard, while in morphine poison, it is always soft. It is not disputed that the pulse of the deceased was soft. The contraction of the pupil of the eye was very great in this case and this always accompanies morphine poison, as shown by the medical testimony. It is true that other symptoms were present in the case of the deceased that might be present in a case of uraemic blood poison. The drug clerk who sold the morphine testified that on the thirteenth of July, 1900, he sold a bottle of similar character and size containing morphine to the defendant; that he was acquainted with the defendant and that she was a customer of the store. The testimony of the defendant herself shows that she was at the store on that morning and that she

made purchases of other articles, but it is true she denies purchasing the morphine.   Morphine was found in the vault in the rear of her residence, and a chemical analysis proved its poisonous character and that it was morphine.   The bottle and the morphine are then accounted for up to the time that they are introduced in evidence.   The defendant lived with the deceased and their little baby of something over a year old and with no one else.   They were living together as man and wife. She did the cooking and waited upon him.   The testimony showed that he had been ailing and that he had confidence in her and that he sent her for medicine and drugs and that he took what she gave him.   She had every opportunity to administer poison.   While it is true that it is hard to believe that a wife or a husband will administer poison to their helpmate, yet the history of the human race shows that this crime is frequently committed.   It is true that no positive evidence exists that she administered to him this morphine that caused his death.   The evidence is circumstantial.   It is also true that it is frequently maintained that circumstantial evidence is inherently of a general and inferior nature from direct or positive testimony; but the fact still exists, nevertheless, that circumstantial evidence, although not invariably so, is most frequently superior in proving power to the average strength of direct evidence; and under the safeguards and qualifications of the law, it affords a secure ground for the most important judgments in cases where direct evidence is not to be obtained.   It must be conceded that with the wisest laws and the most perfect administration of them, the innocent may sometimes be doomed to suffer the fate of the guilty; for it were vain to hope that from any human institution all error can be excluded.   "But certainty has not always been attained even in those sciences which admit of demonstration; still less can unfailing assurance be invariably expected in investigations of moral and con-

State v. Nesenhener.

tingent truths. Nor can any argument against the validity and·
sufficiency of circumstantial evidence as a means of arriving at
a moral certainty be drawn from the consideration that it has
occasionally led to erroneous convictions, which does not
equally apply to an objection against the validity and suffi-
ciency of moral evidence of every kind; but it is believed that a
far greater number of mistaken sentences have taken place in
consequence of false and mistaken direct and positive testimony
than through erroneous inferences drawn from circumstantial
evidence." "Admitting," said Mr. Justice STORY, "the truth of
such cases, are we then to abandon all confidence in circum-
stantial evidence and in the testimony of witnesses? Are we
to declare that no human testimony to circumstances or to
facts is worthy of belief, or can furnish a just foundation of the
administration of public justices? Human imperfection is such
as to render it necessary to depend upon other evidence than
such as is direct." Wills on Circumstantial Evidence, 478;
89 N. C. 462. (2) The general proposition is, under the
decisions in this State, that a verdict will not be disturbed on
appeal on the ground that it is not supported by the evidence,
unless there is a total failure of the evidence or it is so weak
that the necessary inference is that the verdict was the result of
passion, prejudice or partiality. State v. Howell, 100 Mo.
628; State v. Glahn, 97 Mo. 679; State v. Cook, 58 Mo. 546;
State v. Hilterbrand, 116 Mo. 543; State v. Minton, 116 Mo.
605; State v. Thomas, 78 Mo. 327; State v. Jackson, 95 Mo.
623. It is not sufficient to authorize the Supreme Court to
interfere on the ground of failure of evidence to support the
verdict, that a different verdict could well have been returned
by the jury; when proper instructions are given and there is evi-
dence that supports the verdict, it is beyond the province of the
Supreme Court to interfere. State v. Thomas, 78 Mo. 327;

79 Mo. 258; 92 Mo. 265; 3 Waterman and Graham on New Trial, pp. 1339, 1340, 1363.

BURGESS, J.—This is an appeal by defendant from a conviction and sentence of death passed upon her on a charge by indictment of having feloniously administered to her husband, Frank Nesenhener, a large quantity of a certain deadly poison, called morphine, from the effects of which he died.

Several points are urged for a reversal of the judgment, but from the view that we take of the case it will only be necessary to pass upon one, as it goes to the very foundation of the judgment, that is, the want of substantial evidence to support it, in the absence of which it can not be permitted to stand.

In Wills on Circumstantial Evidence (3 London Ed.), 205, it is said: "Upon general principles, however, it can not be doubted that courts of law would require chemical evidence of poisoning, whenever it were attainable; and in that case it would seem but reasonable in analogy to the general rules of evidence, that it should be of the highest character which the nature of the case admits; at least a conviction can not be satisfactory if it be grounded upon evidence of an inferior nature, where evidence of a more satisfactory character is capable of being adduced."

It can not be doubted but that in the case of morphine poisoning the most satisfactory and convincing evidence of poisoning is the discovery, by analysis of the contents of the stomach, of the existence of morphine or traces of it, and, in case of uraemic poisoning by an analysis of the urine.

In Wills' Circumstantial Evidence (by Arthur P. Wills), 388, it is said: "Evidence of chemical tests applied to the body or its contents or excreta, whenever it is capable of being obtained, ought to be adduced, and in such circumstances the failure to adduce such evidence, unexplained by satisfactory

reasons, gives serious ground for doubt as to the reality of the alleged poisoning. The re-agents employed must be free from all impurities if any importance is to be attached to the result obtained."

In the case at hand there was no examination of any kind made, either of the stomach or its contents, bowels, or urine, while there was no apparent reason why one or both should not have been done, and these matters so important to the ascertainment of the cause of the death of the deceased are entirely wanting. On the symptoms and these alone, with the exception of a few suspicious acts upon the part of the accused, the judgment of conviction rests. And these may be stated as follows:

Defendant had been married to the deceased about fifteen years. They lived as happily together as other people in the same walks of life usually do. He had for many months been employed as a boiler washer about the Burlington shops in Hannibal, working at night in and about the roundhouse for said railroad company. They had four children born to them, three of whom were dead, all having died within the same year. Deceased had been in poor health for some time next preceding his death and complained of his stomach and that his food did not agree with him, and had on several occasions been compelled to desist from work. It was proven by the State that the defendant purchased a bottle of morphine on the thirteenth of July, 1900, at Brown's drugstore in Hannibal. The testimony of the drug clerk in this store was that he sold the defendant a small phial of morphine on the thirteenth of July, 1900, and he substantially identified the bottle produced on the trial as the one that he sold the defendant. This bottle and the contents were found in the vault of the closet in the rear of the residence of the deceased by Constable Green and Dr. Banks, the attending physician, on the day of

the death of the deceased.

The defense was that the deceased had been ailing for sometime, and that he had uraemic poisoning, and died of that.    The testimony showed that deceased carried about seven hundred and fifty dollars life insurance, five hundred dollars of which was in the order known as the Ancient Order of the Pyramids, and two hundred and fifty of it in what is known as the Burlington Relief Association.    The record also shows that on one occasion deceased became angry and tore up the fraternal insurance policy in the Ancient Order of the Pyramids, and that defendant went to the secretary of said order, and inquired if the same could be collected if the premiums were paid, although the policy had been destroyed, and on being assured that the money would be collectible if the premiums were paid even though the policy had been destroyed, she stated that she would pay the premiums, and she did so.    The evidence also shows that two of the deceased children of the defendant were insured.

The deceased was ailing several days just prior to his death, and on the morning of the thirteenth of July, 1900, the defendant went to the office of Dr. Banks and stated that Mr. Nesenhener would like for the doctor to stop at home during the day; that deceased would pay the doctor something on the bill he owed.    During the afternoon the doctor stopped at deceased's house and deceased did pay the doctor some money, and during the conversation related certain symptoms to Dr. Banks and asked him to prescribe for him, which the doctor did.    These symptoms were pain and uneasiness in the stomach and loss of appetite.    The doctor gave him a prescription called "Gray's Glycerine Tonic Compound."    At that time deceased was sitting in a chair at the door, apparently not in great agony and seemingly cheerful, and stated that he thought he would be able to resume work in a short time.    This was

in the afternoon of August 13.   That night deceased was ill again, suffered considerable pain and was troubled with vomiting.   Early on the morning of the fourteenth, the defendant went for her son-in-law, who lived nearby, and asked him to come over, as her husband, Frank Nesenhener, was very ill, and the son-in-law came and found the deceased sitting in the kitchen door, purging himself, with a vessel in front of him containing a greenish-looking matter which deceased had thrown off from his stomach.   Deceased stated that he was' very ill, and the son-in-law remained with him while the wife went for a physician.   While the wife was absent, the deceased laid down upon a bed and became unconscious, and remained so until his death which occurred at nine o'clock that night.

The deceased, according to the testimony of the State's expert witnesses, had all the symptoms of morphine poisoning.   The face very blue and discoloration of the neck and the face swollen; the pulse soft, slow and regular, and the breathing hard and labored, all of which the expert testimony showed were symptoms of morphine poisoning.   The expert testimony for the defense tended to show that, with the exception of a soft pulse and tightly contracted pupil of the eye, all of the symptoms of deceased might have been caused by uraemic poisoning.

The defendant denied all knowledge of the bottle of morphine, and claimed that she would not know morphine if she should see it, and that she never purchased any of the drug clerk who testified that he sold it to her on the thirteenth of July, 1900.

The testimony of the experts tended to show that if an overdose of morphine was taken, that it was liable to cause excessive vomiting, which might result in saving the life of the patient, but that in the ordinary poison dose, which would

result in death, vomiting did not always occur.

There was no evidence that defendant administered to deceased any medicine of any kind or character, or food, and no such inference can be drawn from the evidence, unless it be from the mere fact that they were man and wife, and lived together as such.

It thus very clearly appears that there was no direct proof of the fact of poisoning, or substantial evidence that deceased, in fact, died of morphine poisoning. "The indirect proof considered satisfactory in such cases, that of chemical analysis and tests applied to the matter ejected through the influence of the poison from the stomach and bowels, and of all moral circumstances, is wanting. The only fact relied upon, that of symptoms admitted in cases of this nature to be unsatisfactory and unreliable, in this case is particularly defective and unsatisfactory. Where then is there ground for conviction?" [Joe v. State, 6 Florida 591.] If the deceased died of morphine poisoning it might have been demonstrated by a chemical analysis of the contents of the stomach and bowels, or of matter ejected from them, and if he died of uraemic poisoning, by an analysis of his urine, but these tests were not made, while it does not appear that there was anything to prevent it being done, and it is not too much to say, that in a case of life and death, a jury, acting upon such testimony as was adduced on the trial of this case, were not warranted, we think, in finding the defendant guilty because of the total absence of proof that she administered morphine to the deceased, or that morphine poisoning was the cause of his death.

We, therefore, reverse the judgment, and discharge the prisoner.

All concur.