THE STATE v. JEFF HARRIS, Appellant.—23 S. W. (2d) 802.

Division Two, December 11, 1929.

224

*Edgar J. Keating, L. A. Knox* and *C. H. Calloway* for appellant.

*Stratton Shartel*, Attorney-General, and *Don Purteel*, Assistant Attorney-General, for respondent.

BLAIR, P. J.—Indicted for and convicted of murder in the first degree in the Circuit Court of Jackson County, defendant was sentenced to imprisonment for life and was granted an appeal to this court.

The main contention is that the evidence is not sufficient to support the verdict. The disposal of this contention requires an extensive statement of the facts appearing in the voluminous record.

On the afternoon of September 4, 1927, the body of Mrs. Margaret Muehlebach was found in an apartment at 3421-3423 Wyandotte Street in Kansas City. The apartment was owned by her husband and managed by her. Her death was due to injuries inflicted upon her head and body by some blunt instrument which crushed her skull. Attendant circumstances indicated robbery as the motive. Appellant was the janitor of the building, which was three stories in height and contained at least nineteen apartments. He lived in an apartment in the basement. He was taken into custody late in the afternoon on the day of the homicide and was tried and convicted about three months later.

The testimony offered by the State tends to show the following facts:

Deceased lived at 3010 Forest Avenue in Kansas City with her husband John Muehlebach and their son Henry. John Muehlebach was sixty-nine years old. Deceased was sixty-two years old and a short, stout woman, being only five feet and two inches in height and weighing 250 pounds.

Appellant Jeff Harris is a negro. He had been employed as janitor of the apartment for fifteen or sixteen months. In connection with the duties usually expected of a janitor, he seems to have been authorized to collect rents from the tenants of the building. On the evening before the homicide appellant had collected $50 rent money from one of the tenants and, early on the morning of the homicide, he had collected $37.50 and $10 from two other tenants, making a total of $97.50 in all.

Several of the apartments were vacant. About nine o'clock Sunday morning, September 4, 1927, appellant telephoned to the home of deceased. Her son Henry answered the telephone and called deceased to talk to appellant. Afterwards she told Henry she had to go over to the apartment. She left the house about 9:15, using Henry's automobile. She told him she would be back soon, as Henry had an engagement to sing in a church choir at eleven o'clock. As deceased did not return before church time, Henry had to leave to keep his engagement. He returned from church at about 12:30 and found deceased had not returned. This fact worried him and he called the apartment over the telephone and talked to appellant, who said the deceased had been at the building and had shown an apartment to a man and woman and had left about 9:30, saying she was going to church.

Henry called again in a few moments and was informed by appellant that he had not seen deceased and had not seen the automobile which she used. Henry directed appellant to look through the vacant apartments and immediately procured an automobile and drove to the apartment building. He found the automobile his mother had driven parked directly in front of the apartment within easy view from any part of the hall on the first floor of the building. Upon finding appellant, Henry asked him how long the automobile had been parked in front of the building. Appellant had previously informed Henry that he had not seen the automobile. He then stated to Henry that he had just discovered it and telephoned to his father about it. Appellant also stated that he had searched all of the vacant apartments, except apartments numbered 2 and 7. He had not searched those because he had no keys to them. Henry testified that appellant kept all of the keys to the building on a board in the basement.

Henry decided to look first in Apartment No. 7 on the second floor. Appellant was behind him and seemed to lag back and did not start to follow Henry up stairs, and Henry saw appellant turn his head and look toward Apartment No. 2, which was on the first floor on the south side at the west or front end of the building. This action on his part is said to have aroused Henry's suspicion and directed his attention to that apartment. So he decided to look there first. He asked appellant how to get in and appellant said he did not know. Henry asked appellant for a screw-driver and he said he had none. Appellant walked up and felt around the top of the doorjam and stepped back. Thereupon Henry burst in the door by throwing himself against it.

The body of deceased was found on the floor, lying in a pool of blood. There were numerous wounds on her head, more than one of which would likely have proven sufficient to have produced

death. Her handbag was lying open, with its contents thrown upon the floor and the table. Some keys and papers were found lying on the table and in the pool of blood. Only two pennies were found in the handbag. The dress of the deceased had been slightly pulled up as if to disclose whether any money was being carried in her stockings. A necktie which had been torn in two was found beside and under the body. This tie was not traced to appellant in any way and appears to have dropped out of the case further, although there was a suggestion by one of the witnesses that the tie might have been used to strangle the deceased. The experts said nothing about strangulation as the cause of death.

Appellant aided Henry Muehlebach in notifying the police and remained about the apartment without any attempt to escape until he was taken to the police station for questioning. Search of his person disclosed only two or three dollars in money. He voluntarily made a written statement the night of his arrest which was offered in evidence by the State and was not markedly different from his testimony at the trial.

Three or four witnesses testified that appellant visited a certain gambling house or club on the Thursday and Saturday nights preceding the homicide and drank liquor and shot craps and lost some money. On direct examination some of these witnesses testified that his losses on Saturday night were six or seven dollars, although they were not very certain on that point. On cross-examination one of these witnesses stated that appellant's loss on Saturday evening may have been as much as forty-five or fifty dollars, which was about the amount of money he had collected for deceased earlier that evening. The allowable inference from this evidence which the State desired the jury to draw was that appellant gambled away fifty dollars of deceased's money and killed her to avoid having to pay it back, as well as to enable him to keep the $47.50 he had collected on the morning of the homicide.

One of the tenants testified to seeing appellant sitting on the back steps of the building with his head in his hands and exhibiting considerable nervousness. This was about an hour before deceased left her home to go to the apartment building in response to appellant's telephone call. The same witness testified that appellant at that time was wearing a soiled dark shirt and that he was wearing a clean shirt when deceased's body was found later.

As above stated, the door to Apartment No. 2 where deceased's body was found was closed and locked. The lock was a Yale spring lock which fastened without the use of a key when the door closed. Appellant seems to have been the only person having a key, because he says he handed the key to deceased when she reached the building. No weapon was found in the apartment. A careful

search of the entire building was made to discover a possible weapon, but no bloody instrument of that character was found, although there were a number of iron tools and appliances in the building which might well have served such purpose. One of the detectives discovered a fire in the furnace which heated the building. Appellant admitted having started this fire that morning in order to burn the daily accumulation of papers and garbage. A piece of boiler flue-pipe about three inches in diameter and of a length not disclosed was found in the fire box and removed and later produced at the trial. There was no proof that this pipe had been used as the instrument which inflicted the lethal stroke. If it had been so used the furnace fire had purged and removed all traces of such use. Appellant denied having put the pipe in the furnace and said it was not there when he had cleaned the furnace shortly before. This statement excluded the possibility that the piece of pipe had been left in the fire box when the flues of the boiler had been repaired some weeks previously.

The two deputies from the coroner's office disagreed as to the presence of *rigor mortis* in deceased's body when it was first found. The first deputy to arrive was not a physician, but he was widely experienced in work of that character. He said that *rigor mortis* had set in at that time and that the body was stiff. He said that he thought Mrs. Muehlebach must have been dead four or five hours when he first saw the body soon after two o'clock. The other deputy coroner was a physician. He said that the body was still warm when he first saw it and that death had occurred shortly before. It seems certain that deceased did not leave the apartment building after she reached there about nine A. M. None of the tenants of the building saw her leave it. Her automobile was seen in front of the building at various times during the forenoon.

Appellant's statement taken the afternoon or evening of the homicide was put in evidence by the State. His story was that a man and woman came to the apartment building about nine o'clock looking for an apartment and that he showed Apartment No. 2 among others. They were favorably impressed with this apartment and said they would take it. Appellant told them he would have to have Mrs. Muehlebach come over and close the transaction and explain the rules of the building. He telephoned to her and she asked him to hold the prospective tenants until she could get over to the apartment. She arrived in a few minutes and he introduced her to the man and woman and turned them over to her. He then gave her the key to Apartment No. 2 and the three of them entered it. Appellant then left them and returned to his apartment in the basement.

Appellant was unable to remember the names of these prospective tenants, but thought they were from St. Joseph, because he

had heard them talking about a moving picture they had seen in that city. He described the woman as being blond, short and fat and wearing a large hat and a coat with a fur trimmed collar. The man wore chauffeur's clothes. His marked characteristic was that he was cross-eyed. None of the tenants of the building had seen this couple or heard them in the building. Appellant testified that, soon after he left deceased and the man and woman when they entered Apartment No. 2 and returned to his basement apartment, his telephone rang and deceased asked him to bring up pen and ink and the rent money which he had collected. He did so and turned over $97.50 to her in the hallway at the rear of the building. Shortly afterward she called again and told him to come up and get the pen and ink. She then thanked him for his good work in procuring her a tenant. Appellant did not see deceased after that and supposed she had left the building. He did not see the man and woman after he saw them enter Apartment No. 2 with the deceased.

When Henry first came to the building, appellant told him about the visit of the cross-eyed man and the stout blond woman and the business deceased had transacted with them. Appellant repeated the same story to the police. The reason appellant gave for not having the key to Apartment No. 2 to get in and look for Mrs. Muehlebach was that she had rented the apartment and turned the key over to the new tenants. The police officers testified that they had been unable to trace the man and woman appellant had described. None of the tenants had seen or heard them about the building. The inference which the State sought to have the jury draw from such testimony was that no such couple had visited the building that morning and that they and their presence in the building were the invention of appellant to account for his act in summoning deceased to the building.

In his written statement appellant said nothing about the fact that a Mrs. Rickett came to the building the day of the homicide and shortly before deceased's body was discovered. Mrs. Rickett testified that she and her husband drove down from their home in St. Joseph to look for an apartment to move into when they came to Kansas City to live. They reached the apartment building about one o'clock, P. M. Dr. Rickett did not enter the building. Appellant showed Mrs. Rickett Apartment No. 19 on the third floor, but it proved to be larger than she desired. Appellant did not offer to show her a smaller apartment. He said that he had none, and did not seem to be interested in showing her the one apartment. He had the key to Apartment No. 19 at that time. This fact is significant because one of the keys found beside deceased's body in Apartment No. 2 was the key to Apartment No. 19. Henry Muehlebach testified that there was only one key to Apartment

No. 19, while appellant testified that there were three keys and that deceased had two of them.

Appellant testified at the trial that he had told the police of the visit of Mrs. Rickett and thought the fact was mentioned in his statement. At least one of the officers testified that appellant told him at the apartment building when he was called there after deceased's body was discovered that the man and woman to whom he had shown Apartment No. 2 were the only persons who looked at apartments that day.

Only two or three dollars in money were found upon appellant's person when he was taken in custody. It appears from appellant's evidence that the officers returned and made a most minute search of the building and especially the basement, looking for money which they thought appellant had not turned over to the deceased. They failed to find any money. No bloody clothes or bloody weapon were found. One of the officers said that the smell of the furnace fire indicated that clothing or some sort of rags had been burned in it, but this could not be verified by an inspection of the remnants of the fire.

Another circumstance, having some tendency to fix the time of the assault upon deceased, was the testimony of Lena Hale, a tenant living on the third floor above Apartment No. 2 on the first floor, that she heard the sound of groans, apparently coming up the garbage chute that morning. This chute had a door opening into each of the apartments, including Apartment No. 2. She fixed the time of the groans at about 9:30 A. M.

Lorna Freiking lived in the apartment on the second floor directly above Apartment No. 2. She heard no groans or screams, but the door to the garbage chute in her apartment was closed, while the door to the chute in Lena Hale's apartment above was warped to such an extent that it would not stay closed. Lorna Freiking was the only tenant who saw deceased arrive at the building. She thought the time was between eight and nine o'clock, but was not positive on that point.

Considering all of the evidence in the case (that of appellant as well as that of the State), we are impressed that there exists a possible doubt of appellant's guilt. But that is not the test in determining the question before us. We are not the triers of the facts. To the jury alone is confided the duty of determining what weight and credit should be accorded to the testimony of the several witnesses and of weighing the evidence accordingly. Our function as an appellate court is to determine whether there is substantial evidence in the record tending to support the finding of fact made by the jury.

· In passing upon the sufficiency of the evidence to authorize conviction, it is our duty to accept as true the evidence offered by the State and to give the State the benefit of every inference which reasonably and legitimately may be drawn therefrom and to put out of consideration all of the evidence offered by appellant, except in so far as such evidence may aid the State's case. [State v. Henke, 313 Mo. 615, l. c. 627, 285 S. W. 392, and cases there cited.] This rule rests upon the unquestioned right of the jury to believe the State's evidence and to indulge in the State's favor all legitimate inferences properly ·to be drawn therefrom and to disbelieve the whole or any part of the evidence offered by the defense. The propriety of the verdict returned must be judged in the light of this prerogative of the jury. If there is found in the record substantial evidence tending to support the verdict rendered, such verdict may not be disturbed by an appellate court because it may think the jury did not decide the guilt or innocence of the defendant in accordance with the greater weight of the evidence.

The sufficiency of the evidence to support the verdict of the jury in this case is a close question and one which has given us much trouble and great concern. In determining the sufficiency of the evidence, we must put aside entirely the evidence offered by appellant, except as it may aid the State's case. The general rule is that, while the jury may believe any statement made by a defendant which is against his interest, it is not obliged to believe statements in his own interest merely because such statements appear in a statement shown by the State to have been made by said defendant. Hence, we must accept as true any statements made by appellant which are against his interest and which tend to support the verdict of the jury and must put out of consideration any part or parts of said statement favorable to defendant. Following this rule and considering only the State's evidence and laying to one side all of the evidence offered by appellant which tends to show his innocence and anything appearing in his statement having the same tendency and considering only the facts stated therein unfavorable to appellant, what do we find the situation to be?

The State proved and appellant admitted that he summoned deceased to the apartment building about nine o'clock, A. M. The evidence tends to show that she did not leave the apartment building. Her body was found in an apartment to which appellant had exclusive access prior to the time deceased reached the building. Even the deceased had no key to this apartment when she reached the building, because appellant said he gave his key to her. Deceased was undoubtedly beaten to death in that apartment. The

presence of the pool of blood there and the absence of blood stains outside of the apartment conclusively prove this. The jury had the right to disregard appellant's story concerning the visit by prospective tenants and that appellant left deceased in their company and find that such prospective tenants were merely an invention of appellant's mind. The jury could, therefore, have found that appellant lured deceased to the building where she entered the apartment to which he alone controlled access and was there beaten to death and that appellant had failed satisfactorily to account for her being found dead there.

Appellant admitted the collection of $50 for deceased the evening before. The jury could have believed that he lost most, if not all, of that sum in shooting craps that night. Hence, it might have found a motive on appellant's part in killing deceased to avoid prosecution for embezzlement or, at least, to avoid having to raise the $50 which he had spent and to enable him to keep the $47.50 which he had collected that morning and that he opened deceased's handbag and scattered the papers and possibly took any money she might have had to make it appear that she had been robbed and murdered by another and to divert suspicion from himself.

The jury had the right to disbelieve appellant's story concerning the presence of the cross-eyed man and stout blond woman looking for an apartment. With this testimony out of the case for the purpose of measuring the sufficiency of the evidence, it appears exceedingly unlikely that Mrs. Muehlebach could have been killed by anyone else than appellant. She was undoubtedly there before 9:30 o'clock and never left the building. According to appellant's story there was nothing to detain her at the building more than a few moments. She transacted no business with any of the other tenants and was not down in the basement. The jury had the right to believe the testimony of one of the deputies from the coroner's office, rather than that of the other, and to find therefrom that death had occurred four or five hours prior to the discovery of the body, or at some time between 9:30 and 10:30 A. M. One tenant heard groans about 9:30 A. M. Appellant called deceased about 9 A. M. and she did not get to the apartment building until about 9:15 at the earliest.

The jury, therefore, could have found that appellant lured deceased to the apartment about 9:15 to 9:30 o'clock and that the assault upon her was committed about 9:30; that no one but appellant had access to the apartment; that appellant had a motive to kill deceased in order to hide embezzlement of her funds already spent and to avoid paying over to her the balance of the money he had collected for her that morning. The finding of the flue

pipe and the odor of the burning clothing in the furnace, which no one but appellant fired, is a circumstance of little probative value in itself, but certainly was a circumstance which the jury might consider.

While appellant's conduct immediately after the discovery of deceased's body was entirely consistent with his prior ignorance of deceased's death and consistent with his innocence and while he made a good witness for himself, so far as appears from the cold record, those were circumstances for the jury to consider. In determining the credit to be accorded to appellant's testimony, the jury may have attached considerable importance to certain contradictions. Appellant denied being at the gambling house on the preceding Thursday night and denied shooting craps at that place either night. He failed to mention the visit of Mrs. Rickett in his written statement. The jury may have concluded that he purposely failed to mention her visit, but got the idea concerning a couple from St. Joseph from the fact that she came from that city.

If there was in fact only one key to Apartment No. 19 and appellant used that key to show the apartment to Mrs. Rickett about one o'clock P. M. and the same key was found in Apartment No. 2 when the forced entrance was made, the jury had the right to conclude that appellant had been in Apartment No. 2 after Mrs. Rickett left, whether to kill her at that time or to see if she was dead is not of controlling importance. It is possible that Mrs. Muehlebach might have been bound and gagged by appellant and left in Apartment No. 2 earlier that day and not killed until shortly before her body was found. Such theory is consistent with the testimony of the physician deputy coroner that *rigor mortis* had not set in and that the body was still warm when he arrived and not inconsistent with the testimony of Lena Hale concerning groans at 9:30, because those groans might have emanated from a bound and gagged person as well as from one fatally assaulted. Also such theory might account for the presence of the torn apart necktie in and about deceased's body.

On either theory and excluding from consideration appellant's testimony in his own behalf, we think there was sufficient evidence to authorize the jury to lay the commission of the crime at appellant's door. The jury's finding of guilt met the approval of the trial judge who shared with the jury the immeasurable advantage over us of having heard the witnesses, including the appellant, as they testified on the witness stand and of having observed their demeanor while so testifying. Although appellant's testimony appearing in the typewritten record before us leaves the impression that he

made a good witness in his own behalf, we are aware that there may have been something in his testimony as a witness which detracted from the words he employed in testifying and persuaded the trial judge and jury that his story was not the truth.

The fact that the officers were unable to find any of the money upon appellant or hidden about the apartment building, does not prove that he may not have withheld it from deceased and hidden it elsewhere. The warm furnace may have accounted for the failure to discover bloody clothes, if his clothes did become bloody. The weak proof of appellant's previous good character doubtless counted little with the jury, in view of his admitted gambling and drinking propensities and suggested sexual irregularities.

A neighbor testified about seeing a man in his shirt sleeves run across the street from the direction of the apartment house at about ten o'clock and jump into an automobile containing another man and that he was driven away. An incident of that kind is of such common occurrence in a large city as to make the circumstance of little importance. Running is the safest way to negotiate the crossing of a city street in these days of fast moving automobiles.

Appellant cites the following cases in support of his contention that no case was made for the jury: State v. Morney, 196 Mo. 43, 93 S. W. 1117; State v. Jones, 106 Mo. 302, 17 S. W. 366; State v. Scott, 177 Mo. 665, 76 S. W. 950; State v. Mahan, 138 Mo. 112, 39 S. W. 465; State v. Marshall, 47 Mo. 378; State v. Francis, 199 Mo. 671, 98 S. W. 11; State v. Clapper, 196 Mo. 42, 93 S. W. 384; State v. Dickson, 78 Mo. 438; State v. Crabtree, 170 Mo. 642, 71 S. W. 127; State v. Nesenhener, 164 Mo. 461, 65 S. W. 230; State v. Kyles, 247 Mo. 640, 153 S. W. 1047; State v. Snow, 293 Mo. 143, 238 S. W. 1069; State v. Bowman, 294 Mo. 245, 243 S. W. 110.

We have carefully examined all of the cases cited. State v. Morney was a prosecution for arson. Defendant was not shown to have been nearer than a half or three-quarters of a mile to the building which was evidently fired by an incendiary and no motive on defendant's part for setting fire to it was shown. State v. Jones was another arson case, where a barn was burned. There insufficiency of proof that the fire itself was of incendiary origin was suggested by this court, but the reversal was for the exclusion of proper evidence offered by the defendant. State v. Scott was a case of grand larceny. There was no evidence whatever that the cattle charged to have been stolen were ever in defendant's vehicle or in his possession. In fact, there was no substantial evidence that any attempt whatever was made to steal the cattle. State v. Mahan was an embezzlement case. It was not decided on the insufficiency of the evidence. Defendant was charged with receiving money as constable and the proof failed to show whether he re-

ceived it as constable or as deputy constable. This was held to be a fatal variance. State v. Marshall was a prosecution for making a false affidavit. Defendant had sworn to a mere legal conclusion and not to facts. This was held insufficient to convict. State v. Francis was a charge of murder by poison. There was no proof that defendant gave or administered poison to the deceased or that he was present when she took it. In other words, the evidence did not exclude the agency of some other person in deceased's death. State v. Clapper is evidently an erroneous citation, because no judgment had been entered and no appeal was allowable. No other matter was decided or discussed. State v. Dickson was a murder case. Deceased was killed and buried under a log and his body was discovered nearly twenty-seven months afterwards. Defendant falsely reported deceased had left the country in order to divert suspicion from himself. The evidence was held sufficient to justify conviction. State v. Crabtree was a murder case. No motive on defendant's part was shown. He was not observed near the scene of the murder. The possibility that the crime was committed by another was not excluded. State v. Nesenhener was a case of murder by poisoning. While defendant was shown to have purchased a phial of morphine, it was not shown by an analysis of deceased's stomach that morphine rather than uraemic poison caused the death, although the only symptoms shown were also prevalent in uraemia cases. State v. Snow was a case of murder by violence. The judgment was reversed for procedural errors, and not for want of sufficient evidence to prove murder. State v. Kyles was a murder case. It did not depend upon circumstantial evidence and the only question was the sufficiency of the evidence to support the verdict of first degree murder in the absence of proof of deliberation. State v. Bowman was a murder case. Defendant had told witnesses that he killed deceased, cut up her body and burned it in a furnace. The evidence was insufficient because there was no independent proof of the *corpus delicti*, since neither her body nor any trace of it was ever found.

The State relies upon State v. Henke, 313 Mo. 615, 285 S. W. 392, and State v. Concelia, 250 Mo. 411, 157 S. W. 778, which may be said to be in point, and also cites State v. Page, 212 Mo. 224, 110 S. W. 1057; State v. Fogg, 206 Mo. 696, 105 S. W. 618, and State v. Sassaman, 214 Mo. 695, 114 S. W. 590. We fail to see where the last three cases are anywise in point, because proof of guilt in each case rested upon direct and not upon circumstantial evidence.

To the Henke and Concelia cases, the case of State v. Dickson, supra, cited by appellant, may well be added as tending to support the sufficiency of the evidence in the case at bar to authorize the verdict of guilty. Dickson reported that McNab, the deceased, had left the country, although his body

was in fact buried under a log in a field where Dickson and Mc-Nab were shown to have been working together just about the time of McNab's disappearance. The finding of the body there, coupled with some remarks showing ill-will toward McNab and Dickson's false account of McNab's departure from the country, were held sufficient to justify the verdict of guilty of murder in the first degree. In the case at bar, if the jury disbelieved appellant's story concerning the presence of the couple looking for an apartment when he called deceased, it had the right to find that appellant concocted that story to divert suspicion from himself. In the Dickson case this is said to be strong circumstantial proof of guilt.

The Henke case was ruled largely by the circumstance that the possibility of any one except Henke killing his wife was quite satisfactorily excluded under all of the evidence. In the Concelia case, Concelia was the last person seen with deceased before his body was found. The trail of blood led from a place adjacent to Concelia's lodging. Deceased had money when he left with Concelia and his pockets were turned inside out when his body was found.

All of the cases referred to lay down the general rule that, to authorize conviction for crime upon circumstantial evidence alone, the facts and circumstances shown must not only be consistent with one another and point to the guilt of the accused, but must be inconsistent with any reasonable hypothesis of his innocence.

If the jury in the case at bar rejected as untrue appellant's story concerning the presence of the strange couple and that deceased was left by him in their presence, as the jury must have done, it was authorized to find that the facts and circumstances shown were inconsistent with any reasonable theory of appellant's innocence. There was a substantial basis for a finding of motive. The body was found in a place exclusively under appellant's control. No one other than appellant was shown to have been about Apartment No. 2 at any time near the probable time of deceased's death.

The question of the sufficiency of the evidence is a close and difficult one, but after a most careful and painstaking study of the entire record we are unable to say that the trial court erred in overruling the demurrer to the evidence or in refusing to set aside the verdict on the ground of the insufficiency of the evidence.

It cannot be said, as appellant contends, that there is no evidence authorizing submission of the case upon first degree murder. In cases like State v. Kyle, supra, and State v. Snow, supra, cited by appellant, there was no proof that the homicide was committed by means of poison or by lying in wait or was committed in the perpetration or attempted per-

238

petration of robbery or other crime mentioned in Section 3230, Revised Statutes 1919, defining murder in the first degree, and hence proof of deliberation was necessary to raise the homicide from murder in the second degree to murder in the first degree. Here, if defendant killed the deceased, he must have done so to prevent discovery of his embezzlement and to keep the money he had collected or possibly even to rob her. Such evidence, together with the allowable inference that appellant lured deceased to a spot wholly under his control to assault her, furnishes ample proof of deliberation. If robbery or attempted robbery occurred in connection with the homicide, it was murder in the first degree without other evidence of deliberation.

Complaint is made because the trial court overruled appellant's motion to strike from the record all of the testimony of and concerning the iron pipe introduced in evidence. Testimony of this character was admitted without objection and we think it was proper for the jury to consider it as a circumstance in the case. The pipe was an instrument of the sort which might have been used to inflict the wounds found upon the head and body of deceased. It was found in the furnace over which appellant exercised control and in which appellant admitted he started a fire on the morning of the homicide. He denied all knowledge of the presence of the pipe in the fire box, but it is difficult to understand how an instrument of that sort could be where it was found without him knowing it was there. The use of fire would naturally suggest itself as a ready and sufficient method of removing from the pipe all evidence of its use as a death dealing instrument, if it had been so used. We think the court properly admitted this proof and hence did not err in refusing to withdraw its consideration from the jury.

The foregoing disposes of all the assignments of error appearing in appellant's brief. No complaint is made concerning the action of the court in giving or refusing instructions, except its refusal to give a peremptory instruction to acquit. Complaint is made in the motion for new trial of improper argument to the jury made by the prosecuting attorney and the failure of the court to require the court reporter to take down such argument. Assignments of this character do not prove themselves and cannot be considered by us because the bill of exceptions is devoid of any reference thereto, except in the motion for new trial itself.

Notwithstanding the indictment, verdict and judgment have not been assailed in the motion for new trial we have examined them carefully. We find that the indictment properly and in appropriate language charges appellant with the crime of murder in the first

degree. By its verdict in due and approved form the jury found appellant guilty of murder in the first degree, as charged in the indictment and assessed his punishment at life imprisonment. Such verdict was sufficient to authorize the entry of the judgment appealed from which complies with all legal requirements.

Finding no procedural error and being satisfied that the evidence was sufficient to authorize the jury to render the verdict it agreed upon and returned into court, nothing remains except to affirm the judgment, which is accordingly ordered. *White, J.,* concurs; *Walker, J.,* absent.